*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |  |
|---|---|---|
| STATE OF ALASKA, DEPARTMENT OF REVENUE, | ) ) ) | Supreme Court No. S-17642 |
| Appellant, | ) ) | Superior Court No. 3AN-18-06908 CI |
| v. | ) ) | O P I N I O N |
| NORTH PACIFIC FISHING, INC. and U.S. FISHING, LLC, | ) ) ) | No. 7524 – May 7, 2021 |
| Appellees. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani Crosby, Judge.

Appearances: Laura F. Fox, Senior Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellant. Leon T. Vance, Faulkner Banfield, P.C., Juneau, and James E. Torgerson, Stoel Rives LLP, Anchorage, for Appellees.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

BOLGER, Chief Justice.

## I.    INTRODUCTION

Two commercial fishing companies catch and process fish in the Exclusive Economic Zone off the Alaska coast but outside Alaska's territorial waters. Their vessels arrive at Alaska ports where they may transfer processed fish directly to foreign-bound

cargo vessels or transfer processed fish to shore for storage and later loading on cargo vessels. Because the companies do not process fish in Alaska, they do not pay the taxes imposed on other processing vessels operating out of Alaskan ports, but their fisheries business activities are subject to a state "landing tax." The fishing companies argue that this landing tax violates the Import-Export and Tonnage Clauses of the United States Constitution and 33 U.S.C. § 5(b). But we conclude that the tax is imposed before the fish product enters the stream of export commerce, that the tax does not constitute an "impost or duty," and that the tax therefore does not violate the Import-Export Clause. We further conclude that the tax is not imposed against the companies' vessels in violation of the Tonnage Clause or 33 U.S.C. § 5(b).

## II. FACTS AND PROCEEDINGS

### A. North Pacific's Operations

North Pacific Fishing, Inc. and U.S. Fishing, LLC (North Pacific) are Washington companies authorized to do business in Alaska. Both own fishing vessels operating in the Exclusive Economic Zone (EEZ) but outside Alaska's territorial waters.[1] North Pacific's vessels are "catcher/processors," which both harvest and process fish in the EEZ. They do not fish in Alaska, but arrive in Alaska ports to unload processed fish.

---

[1] The EEZ is a zone contiguous to United States territorial waters that extends 200 miles from shore and into international waters. Proclamation No. 5030, 48 Fed. Reg. 10,605-06 (Mar. 14, 1983); *see also* 46 U.S.C. § 107 (2018). Within the EEZ the United States retains "sovereign rights for the purpose of exploring, exploiting, conserving and managing natural resources . . . and with regard to other activities for the economic exploitation and exploration of the zone." Proclamation No. 5030, 48 Fed. Reg. at 10,605-06. Alaska's territorial waters extend 3 miles from shore, and federal territorial waters extend 12 miles from shore. 5 Alaska Administrative Code (AAC) 39.975(a)(13) (2019) (defining Alaska territorial waters); 33 C.F.R. § 2.22 (2020) (defining federal territorial waters); *see also* 43 U.S.C. § 1312 (2018) (authorizing state extension of "seaward boundaries" to 3 miles from shore); 33 U.S.C. § 151 (2018) (authorizing the establishment of demarcation lines up to 12 miles from shore).

The fish product may be unloaded to warehouses on shore, to shipping containers on the docks, or directly to cargo ships waiting in port.

North Pacific exports nearly all of its fish product on foreign-flagged vessels, which are prohibited by law from delivering cargo from one United States domestic port to another.[2] Sometimes a buyer is identified before processed fish is loaded onto a cargo vessel; other times the sale is not arranged until the vessel is en route to a foreign port. During the years at issue, North Pacific caught and processed fish only in the EEZ, and nearly all of its fish product was eventually transferred to foreign-flagged cargo ships. The parties agree that North Pacific's nominal shipments of processed fish to Washington have no impact on the issues raised in this appeal.

### B.    The Landing Tax

The EEZ catcher/processors like North Pacific do not catch or process fish in Alaska waters, but their operations place a burden on state resources:

> The EEZ catcher/processors have a significant presence in the state, including transferring of the processed fisheries resource product, taking on and disembarking of crew, taking on of fuel and supplies, obtaining repairs, discharging waste, and making use of sheltered waters.  Additional burdens resulting from the fleet presence impact the state and local communities through increased demands on educational systems, road maintenance, public safety, airports, docks, hospitals, and other programs provided or financed by the state or local communities.[3]

Because North Pacific catches and processes its fish outside of Alaska waters it is not subject to the state's "fisheries business tax" on catching or processing fish within

---

**2**    *See* 46 U.S.C. §§ 12102, 12103, 12112 (excluding foreign-flagged ships from eligibility for coastwise trade endorsement).

**3**    15 AAC 77.005(b) (2013).

the state.[4] "To compensate the state for the burdens that fish catcher/processors operating in the [EEZ] impose[] upon the state and local communities, as well as for the benefits the EEZ catcher/processors receive," catcher/processors like North Pacific instead pay the "fishery resource landing tax."[5] The landing tax is "substantially equivalent" to the taxes imposed on the rest of the fishing industry, and is intended to be "a payment for the services and benefits conferred" on the EEZ catcher/processors rather than "a fee on fisheries resources simply moving through the state."[6]

The landing tax applies to anyone "engag[ing] in a floating fisheries business in the state and who owns a fishery resource that is not subject to [the fisheries business tax] but that is brought into the jurisdiction of, and first landed in" Alaska.[7] It provides a credit for any taxes paid in another jurisdiction that are "equivalent in nature" to the Alaska tax.[8] The landing tax applies "without regard to the final destination of" the fish product.[9] And like the fisheries business tax, the landing tax is based on the value of the raw, unprocessed fish as extrapolated from the value of the processed fish

---

[4] AS 43.75.100 (imposing tax on businesses that take fish within Alaska for sale out of state); AS 43.75.015 (imposing tax on businesses that process fish within Alaska).

[5] AS 43.77.010.

[6] 15 AAC 77.005(c).

[7] AS 43.77.010. "Landing" is defined as "unloading or transferring a fishery resource," also known as "transloading." AS 43.77.200(4).

[8] AS 43.77.030; 15 AAC 77.035(a); *see* AS 43.77.010; 15 AAC 77.030(c).

[9] 15 AAC 77.030(f).

product the catcher/processors land.[10]  The landing tax is thus "designed and intended to be a compensatory tax to complement the fisheries business tax."[11]

### C.    Legal Proceedings

In 2016 North Pacific informed the Alaska Department of Revenue (the Department) that it considered the landing tax unconstitutional as applied to its activities. North Pacific claimed the tax violated the Import-Export and Tonnage Clauses of the United States Constitution[12] and requested a refund of taxes paid in previous years.  The Department's Tax Division issued an informal decision denying all of North Pacific's claims.

North Pacific then appealed to the Office of Administrative Hearings (OAH), which affirmed the Tax Division's decision.  North Pacific reiterated its constitutional arguments and additionally claimed a violation of 33 U.S.C. § 5(b).[13]  It argued that the landing tax, as a direct tax on goods in export transit, violated the Import-Export Clause and was barred by the holding in *Richfield Oil Corp. v. State Board of Equalization*.[14]  The Department responded that the more recent decision in *Michelin Tire Corp. v. Wages*[15] established the correct test, under which the landing tax was

---

[10]    *See* AS 43.77.010, 43.75.015(c), 43.75.290(7); 15 AAC 77.040.

[11]    15 AAC 77.005(a).

[12]    U.S. Const. art. I, § 10, cl. 2 (Import-Export Clause), cl. 3 (Tonnage Clause).

[13]    33 U.S.C. § 5(b) largely codifies Tonnage and Commerce Clauses common law.  *See* U.S. Const. art. I, § 10, cl. 3; 148 CONG. REC. E2143-04 (daily ed. Nov. 22, 2002) (statement of Rep. Don Young).

[14]    329 U.S. 69 (1946).

[15]    423 U.S. 276 (1976).

permissible. OAH declined to say that *Richfield* had been overruled but found it inapplicable, reasoning that the landing tax was imposed neither on the fish product nor during the export process. Applying *Michelin* OAH found no violation of the Import-Export Clause.

OAH also rejected North Pacific's claim that the landing tax was based on its vessels or its use of navigable waters in violation of the Tonnage Clause. Finally, OAH rejected the 33 U.S.C. § 5(b) challenge as derivative of the other failed arguments.

North Pacific next appealed to the superior court, which concluded that "*Richfield* remains good law and is dispositive here." The court reversed OAH as to the Import-Export Clause, concluding that all of North Pacific's fish product was in the export stream when the landing tax applied, and that the tax applied directly to the processed fish. Because the court found the landing tax unconstitutional under the Import-Export Clause, it did not reach North Pacific's other claims.

The Department appeals, asking us to reverse the superior court and affirm the OAH on all counts. North Pacific asks us to affirm the superior court's decision or, alternatively, hold that the tax violates the Tonnage Clause and 33 U.S.C. § 5(b).

## III. STANDARD OF REVIEW

"When the superior court acts as an intermediate appellate court, we undertake an independent review of the agency determination, and we may affirm . . . on any ground supported by the record."[16] We review de novo questions of constitutional law and statutory construction and will "adopt the rule of law most consistent with

---

[16] *Benavides v. State*, 151 P.3d 332, 334 (Alaska 2006).

precedent, reason, and policy."[17] "A presumption of constitutionality applies," and we resolve any doubts in favor of a law's constitutionality.[18]

## IV. DISCUSSION

### A. The Landing Tax Does Not Violate The Import-Export Clause.

The Import-Export Clause dictates, "No [s]tate shall, without the consent of the Congress, lay any imposts or duties on imports or exports."[19] Like the Export and Commerce Clauses, it is intended to prevent friction between the states and burdens on interstate or foreign commerce.[20] The same analysis therefore often applies to all three clauses.[21]

Import-Export cases were traditionally analyzed under the "stream of export" or "continuous route" doctrine explained in *Richfield*, which prohibits the states from directly taxing goods in the stream of export commerce.[22] Goods and resources

---

[17] *Se. Alaska Conservation Council, Inc. v. Dep't of Nat. Res.*, 470 P.3d 129, 136 (Alaska 2020) (quoting *State, Div. of Elections v. Green Party of Alaska*, 118 P.3d 1054, 1059 (Alaska 2005)).

[18] *State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 71 (Alaska 2001) (quoting *Baxley v. State*, 958 P.2d 422, 428 (Alaska 1998)).

[19] U.S. Const. art. I, § 10, cl. 2.

[20] *Id.* § 8, cl. 3 (Commerce Clause); § 9, cl. 5 (Export Clause); *see Dep't of Revenue v. Ass'n of Wash. Stevedoring Cos.*, 435 U.S. 734, 754-55 (1978) (describing purpose of Import-Export and Commerce Clauses).

[21] *See Wash. Stevedoring*, 435 U.S. 734 at 754 ("[T]he desire to prevent interstate rivalry and friction [expressed in the Import-Export Clause] does not vary significantly from the primary purpose of the Commerce Clause."); *Empresa Siderurgica v. Cty. of Merced*, 337 U.S. 154, 156 (1949) (applying reasoning from Commerce Clause jurisprudence to case under Import-Export Clause).

[22] *Richfield Oil Co. v. State, Bd. of Equalization*, 329 U.S. 69, 85 (1946); *see* (continued...)

remain taxable until they are on a continuous route to exportation.[23] The analytical focus under *Richfield* is thus on timing: whether definite commitment to the export stream has transformed the good into a tax-exempt export when the tax is assessed.

The Supreme Court updated its Import-Export jurisprudence in *Michelin*, shifting its focus to the purposes of the Clause.[24] The Import-Export Clause addresses three main concerns: (1) "the Federal Government must speak with one voice when regulating commercial relations with foreign governments"; (2) "import revenues . . . should not be diverted to the [s]tates"; and (3) seaboard states must be "prohibited from levying taxes on citizens of other [s]tates by taxing goods merely flowing through their ports to the other [s]tates not situated as favorably geographically."[25] Under *Michelin* only taxes contrary to these purposes are prohibited by the Import-Export Clause.

In *Department of Revenue v. Ass'n of Washington Stevedoring Cos.* the Court expressly extended this analysis to export goods, explaining that the first and third of the *Michelin* principles were implicated when a state levied a tax on exports, and recognized that *Michelin* had "initiated a different approach to Import-Export Clause cases."[26] But the Court declined to extend *Michelin*'s purpose-driven analysis to taxes

---

[22]     (...continued)
*also Coe v. Town of Errol*, 116 U.S. 517, 527 (1886) (holding logs passing through one state from another were in continuous export transit and untaxable under Commerce Clause).

[23]     *Empresa Siderurgica*, 337 U.S. at 157 (holding partially dismantled cement plant, sold to foreign buyer but not yet en route, remained taxable).

[24]     *Michelin Tire Corp. v. Wages*, 423 U.S. 276 (1976).

[25]     *Id.* at 285-86.

[26]     435 U.S. at 759 (quoting *Kosydar v. Nat'l Cash Register Co.*, 417 U.S. 62,
(continued...)

assessed directly on goods while in import or export transit, and it has never expressly overruled the stream of export cases.**[27]**

The Department argues that *Richfield* was functionally overruled by *Michelin*. It alternatively argues that if *Richfield* is good law, it does not control here, as the landing tax is neither imposed directly on the fish product nor assessed while that product is in the export stream. North Pacific insists that *Richfield* is dispositive and bars application of the landing tax to its business activities.

The Supreme Court has repeatedly signaled that *Michelin* represents the "modern" Import-Export Clause doctrine,**[28]** and we begin our analysis there. But we do not assume that *Richfield* has been wholly abandoned, leaving to the Supreme Court "the prerogative of overruling its own decisions."**[29]** In any case we need not resolve which test is appropriate here as we conclude that the landing tax is permissible under both.

---

**[26]** (...continued)
70-71 (1974)); *see also Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 77 (1993) (describing *Michelin* as the "modern Import-Export Clause test"); *Limbach v. Hooven & Allison Co.*, 466 U.S. 353, 359-60 (1984) (noting *Michelin* "adopted a fundamentally different approach" and "specifically abandoned" the broader prohibition on all import taxation); *State, Dep't of Revenue v. Alaska Pulp Am., Inc.*, 674 P.2d 268, 279 (Alaska 1983) (identifying *Michelin* as proper test for Import-Export Clause cases).

**[27]** *Wash. Stevedoring*, 435 U.S. at 757 n.23 ("We do not reach the question of the applicability of the *Michelin* approach when a [s]tate directly taxes imports or exports in transit."); *United States v. Int'l Bus. Machs. Corp.*, 517 U.S. 843, 862 (1996) (stating that *Richfield* had been distinguished but not overruled).

**[28]** *Itel Containers Int'l Corp.*, 507 U.S. at 77; *see also Wash. Stevedoring*, 435 U.S. at 759; *Kosydar*, 417 U.S. at 70-71.

**[29]** *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

### 1. The landing tax does not conflict with the purposes of the Import-Export Clause.

To determine whether the landing tax conflicts with the purpose of the Import-Export Clause, we apply the relevant standards described in *Michelin* and *Washington Stevedoring*: (1) a tax may not interfere with the federal government's ability to speak with one voice on foreign trade; and (2) coastal states may not disturb interstate harmony by "levying taxes on citizens of other [s]tates by taxing goods merely flowing through their ports."[30] If these "constitutional interests are not disturbed, the tax should not be considered an '[i]mpost or [d]uty.' "[31]

The landing tax does not "prevent[] the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments.' "[32] It creates no special tariffs and "cannot be applied selectively to encourage or discourage" exportation.[33] The tax may have an incidental effect on fish prices and subsequently on the export market, but the same is true of much domestic

---

[30] *Wash. Stevedoring*, 435 U.S. at 735 (quoting *Michelin*, 423 U.S. at 285-86). A third policy identified in *Michelin* — preventing the diversion of import revenue to the states — does not apply here because the federal government may not tax exports and therefore has no potential tax revenue to divert. U.S. Const. art. I, § 9, cl. 5. In any case, the federal government does not tax North Pacific's fish product or the operation of a floating fisheries business; if it did, a tax credit would apply. *See* 50 C.F.R. §§ 679.90-95, 679.80-85 (establishing federal fishing programs but not imposing federal tax); AS 43.77.030 (establishing credits for taxes paid in other jurisdictions).

[31] *Wash. Stevedoring*, 435 U.S. at 758.

[32] *Itel Containers Int'l Corp.*, 507 U.S. at 72 (quoting *Japan Line, Ltd. v. Los Angeles Cty.*, 441 U.S. 434, 451 (1979)); *see also id.* at 77 ("[T]he one voice component of the *Michelin* test is the same as the one voice component of our *Japan Line* test.").

[33] *See Michelin*, 423 U.S. at 286 (focusing on general application of tax, regardless of import status).

taxation. Prevention of these sorts of incidental effects was "not even remotely an objective of the Framers."[34]

Nor does the landing tax disturb interstate harmony or "tax goods merely flowing through [Alaska's] ports."[35] A tax will not run afoul of this proscription if it has "a reasonable nexus to the state, is properly apportioned, does not discriminate, and relates reasonably to the services provided by the state."[36] The landing tax satisfies these requirements.

First, the tax has a reasonable nexus to Alaska: North Pacific conducts its relevant commercial activities within the state, "including transfer of fishery resources or processed products, taking on and disembarking crew, taking on fuel or supplies, obtaining vessel or gear repairs, discharging wastes, seeking protection in sheltered waters, and any other related activity that makes a claim on the resources of the state."[37]

Second, the landing tax is not unfairly apportioned or discriminatory against interstate or foreign commerce. It falls on activities occurring within Alaska; no activity occurring in any other state is implicated. The tax was specifically designed to achieve "equality of treatment between local and interstate commerce."[38] The state treats fish product intended for export no differently than fish product sold for local consumption,

---

[34] *Id.* at 287.

[35] *Wash. Stevedoring*, 435 U.S. at 735 (quoting *Michelin*, 423 U.S. at 285-86).

[36] *Id.* at 754-55 (explaining that this purpose "does not vary significantly from the primary purpose of the Commerce Clause").

[37] AS 43.77.200(2); *see also* AS 43.77.010; 15 AAC 77.005.

[38] 15 AAC 77.005(c).

and the landing tax imposes an equal or lower rate than the fisheries business tax imposed on wholly in-state floating fisheries businesses.[39]

Finally, the landing tax is "fairly related to the services provided by the [s]tate."[40] The state has rationally concluded that businesses such as North Pacific benefit from state services including road maintenance, public safety, public health infrastructure, medical facilities, and educational systems.[41] The state has further concluded that these businesses' activities burden state resources.[42] The landing tax is assessed to pay for these benefits and burdens. It is a measure "by which a [s]tate apportions the cost of such services as police and fire protection among the beneficiaries."[43] There is no reason a floating fisheries business like North Pacific should not bear its fair share of those costs.[44]

---

[39] *Compare* AS 43.75.015 (three to five percent tax on fish processed by floating fisheries business under fisheries business tax), *with* AS 43.77.010 (one to three percent tax on fish processed by floating fisheries business under landing tax).

[40] *Wash. Stevedoring*, 435 U.S. at 750.

[41] *See* 15 AAC 77.005.

[42] *See id*.

[43] *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 287 (1976); *see also Joy Oil Co. v. State Tax Comm'n of Mich.*, 337 U.S. 286, 288 (1949) (explaining that Import-Export Clause is not meant "to relieve property eventually to be exported from its share of the cost of local services").

[44] *See Michelin*, 423 U.S. at 287 ("[T]here is no reason why an importer should not bear his share of these costs along with his competitors handling only domestic goods. The Import-Export Clause . . . cannot be read to accord imported goods preferential treatment that permits escape from uniform taxes imposed . . . for services which the [s]tate supplies.").

The landing tax does not violate the purposes of the Import-Export Clause and therefore satisfies the *Michelin* standard. North Pacific does not contest this point. Instead, it argues that *Michelin* is inapplicable and that *Richfield* controls.

## 2. The landing tax is not assessed on goods in export transit.

Under the stream of export commerce doctrine explained in *Richfield*, the Import-Export Clause bars states from assessing taxes directly on goods after they enter the stream of export commerce.[45] In *Richfield* the Supreme Court held that imposing a state sales tax on oil sold for export violated the Import-Export Clause.[46] The oil was transported overland by the seller and stored on the dock in tanks owned by the seller.[47] It was then pumped to a foreign-flagged tanker, completing the sale and triggering the tax, which the state characterized as being levied on merchants "for the privilege of selling tangible personal property at retail."[48] The Court determined that the tax was assessed directly on the oil and that its arrival in the hold of the tanker unequivocally committed it to export.[49] Because the oil's delivery to the tanker also completed the sale and triggered the tax, the sales tax violated the Import-Export Clause.[50]

Under the *Richfield* line of cases, direct taxes on goods in export transit are unconstitutional regardless of whether they conflict with the clause's purpose. To determine whether the landing tax is permissible under *Richfield,* we therefore must

---

[45] *See Richfield Oil Corp. v. State Bd. of Equalization*, 329 U.S. 69, 84 (1946).

[46] *Id.* at 83, 85-86.

[47] *Id*. at 82-83.

[48] *Id.* at 83.

[49] *Id.* at 84.

[50] *Id.* at 85.

decide two issues: (1) Is the landing tax assessed directly on the fish product, or on a separate business activity? (2) Has the fish product entered the stream of export commerce when it is taxed? We conclude that while the tax is assessed on the fish product, this occurs before it enters the stream of export. The landing tax is therefore permissible under *Richfield.*

### a. The tax is assessed on the fish product.

Not all taxes applied during the export process fall directly on the export goods, and taxes levied on distinct business activities rather than on the goods themselves are too indirect to violate the Import-Export Clause.[51] The Department argues that the landing tax is not assessed on the fish product, but on the commercial activity of operating a floating fisheries business. But the Department's characterization of the tax is not dispositive, and we conclude that the landing tax is imposed directly on the processed fish rather than on an associated activity.[52]

This issue "turns not on the characterization which the state has given the tax, but on its operation and effect."[53] Taxes that are on the sale of goods or measured by their retail value are effectively taxes on those goods.[54] On the other hand, taxes on services and business activities associated with the export process are not, and thus fall

---

[51]     *See Dep't of Revenue v. Ass'n of Wash. Stevedoring Cos.*, 435 U.S. 734, 761 (1978) (upholding tax because it "does not fall on the goods themselves").

[52]     *See Richfield*, 329 U.S. at 83-84; *see also Dulles Duty Free, LLC v. Cty. of Loudoun*, 803 S.E.2d 54, 62 (Va. 2017) (holding that tax imposed on gross receipts of business selling duty-free goods was in "operation and effect" a direct tax on exports).

[53]     *Richfield*, 329 U.S. at 83-84.

[54]     *See Wash. Stevedoring*, 435 U.S. at 756 n.21 (distinguishing between direct and indirect taxes based on closeness of relation between measure of tax and value of goods); *Richfield*, 329 U.S. at 84 ("[A] tax on the sale of an article . . . is a tax on the article itself." (quoting *Brown v. Maryland*, 25 U.S. 419, 444 (1827))).

outside the scope of the Import-Export Clause. In *Washington Stevedoring* the Court upheld Washington's occupation tax on loading export cargo, as the tax was measured by the amount of loading activity rather than the value of the goods, and was therefore not a tax on the goods.[55] Similarly, the Court held in *Itel Containers International Corp. v. Huddleston* that a sales tax levied on the lease of shipping containers was not a direct tax on the export goods stored in the containers.[56] In both cases, the taxes were indirectly based on the volume of export goods, not directly on their retail value.[57] And the taxes were imposed on the provider of a service "distinct from the goods and their value," not the buyer or seller of the goods.[58]

The landing tax, on the other hand, is assessed on the value of the unprocessed fish as calculated from the weight and species of the processed fish product once landed.[59] The Department describes this measure as "a proxy for the extent of [North Pacific's] business activities in Alaska," but this does not change the fact that the tax is actually calculated based on the value of the fish. The sales tax at issue in *Richfield* could also rationally have been described as a proxy for the extent of the exporter's

---

[55]     *Wash. Stevedoring*, 435 U.S. at 755-56.

[56]     507 U.S. 60, 77 (1993).

[57]     *Id.* ("[The] tax is levied on leases transferring temporary possession of containers to third parties in Tennessee; it is not levied on the containers themselves or on the goods being imported in those containers."); *Wash. Stevedoring*, 435 U.S. at 763 (Powell, J., concurring).

[58]     *Wash. Stevedoring*, 435 U.S. at 737 (majority opinion); *see also Itel Containers*, 507 U.S. at 77.

[59]     AS 43.77.010; AS 43.77.200(7) (describing value calculation).

business activities in California, but it was still a tax on the export goods.[60] So is the landing tax.

The measure of the landing tax is based directly on the value of the fish product, not indirectly on its volume. Further, the tax is imposed on the entity producing and selling the fish product, not a third party providing a distinct service.[61] The landing tax falls on the fish product; whether this is permissible therefore turns on whether the product is in export transit when the tax takes effect.

### b. The landing tax is applied before the fish product enters the stream of export commerce.

Under *Richfield* a tax does not violate the Import-Export Clause unless it is imposed on goods in export transit.[62] If the landing tax is assessed before the fish product enters the stream of export commerce, it is permissible. North Pacific argues that the fish product enters export transit when it crosses from the EEZ to Alaska's territorial waters, because after that point it is merely in transit through the state and cannot be taxed. North Pacific alternatively claims that the tax is assessed simultaneously with the fish product's entrance to the stream of export commerce when it is unloaded from the catcher/processors. The Department responds that the fish product is not merely in transit through Alaska and that the tax is triggered by landing the fish product, which occurs before it is committed to export transit.

### i. The fish product's movement from the EEZ to Alaska does not begin export transit.

We first conclude that North Pacific's fish product does not enter the stream

---

[60]     *See Richfield Oil Corp. v. State Bd. of Equalization*, 329 U.S. 69, 80 (1946).

[61]     *See Itel Containers*, 507 U.S. at 77; *Wash. Stevedoring*, 435 U.S. at 737-38.

[62]     *Richfield*, 329 U.S. at 82-83 (holding that a good becomes an untaxable export only when physically committed to export transit).

of export before reaching an Alaska port. Its continuous route to export does not begin in the EEZ because transport from the EEZ to Alaska — the only state the fish product will ever enter — is not interstate commerce and the product is therefore not merely in transit through the state. North Pacific is merely preparing the fish product for export when its vessels bring the fish product toward port. This is not enough to commit the fish product to export transit. Only when the fish product reaches the hold of a foreign-flagged cargo ship does it become a tax-exempt export.

The moment when the export process begins and goods become exempt from taxation "is not an easy matter to designate or define, and yet it is highly important, both to the shipper and to the state, that it should be clearly defined so as to avoid all ambiguity or question."[63] To define this moment courts consider whether the goods have been committed on a "continuous route" to export.[64] And what constitutes entrance to the stream of export commerce may depend on whether the goods have entered the stream of interstate commerce.[65]

The Supreme Court first announced its stream of export doctrine in *Coe v. Town of Errol*.[66] New Hampshire had taxed logs stored on a New Hampshire riverbank while on their way downstream to be exported.[67] Some of the timber had been felled in

---

[63]     *Coe v. Town of Errol*, 116 U.S. 517, 526 (1886).

[64]     *Id.* at 527.

[65]     *Id.*

[66]     *Id.*

[67]     *Id*. *Coe* was decided under the Commerce Clause, but the Court has repeatedly explained that the same analysis applies in Import-Export Clause cases. *See, e.g., Dep't of Revenue v. Ass'n of Wash. Stevedoring Cos.*, 435 U.S. 734, 752 (1978); *Kosydar v. Nat'l Cash Register Co.*, 417 U.S. 62, 67 (1974); *Empresa Siderurgica v. Cty.*
(continued...)

New Hampshire, some shipped from out of state.[68] And in its analysis, the Court distinguished between the two sources of timber.[69] It held the tax unconstitutional as applied to the out-of-state logs, which had entered the export stream when they left their state of origin and were already in transit when taxed.[70] But the Court upheld the tax on the local timber, explaining that the intrastate movement of a product was not part of the export journey:

> The carrying of [a product] . . . to the depot where the journey is to commence, is no part of that journey. . . . Until actually launched on its way to another state . . . . its destination is not fixed and certain. It may be sold or otherwise disposed of within the state, and never put in course of transportation out of the state. Carrying it from the farm or the forest to the depot is only an interior movement . . . . It is no part of the exportation itself. Until shipped or started on its final journey out of the state its exportation is . . . not at all a fixed and certain thing.[71]

The logs would not become untaxable exports until being shipped to another state, "start[ing] upon such transportation in a continuous route or journey."[72] Prior movement

---

(...continued)
*of Merced*, 337 U.S. 154, 156 (1949); *Richfield*, 329 U.S. at 79.

[68]     *Coe*, 116 U.S. at 525-26.

[69]     *Id.*

[70]     *Id.* at 526; *see also Carson Petroleum Co. v. Vial*, 279 U.S. 95, 109 (1929) (concluding oil transported into state and stored for exportation was exempt from state tax).

[71]     *Coe*, 116 U.S. at 528-29.

[72]     *Id.* at 527.

in their state of origin was merely "partial preparation" for export and did not trigger tax exemption.[73]

More recent cases have relied on *Coe*'s distinction between goods originating in the taxing state and those merely in transit through it. In *Sumitomo Forestry Co. of Japan v. Thurston County*, Washington state levied a tax on logs that had been cut in the state, transported across the state, and stored in a state harbor awaiting export.[74] The Ninth Circuit upheld the tax because the logs, which were not "interrupted on a journey through Washington from another state to a foreign destination," had not yet entered the stream of export.[75]

The Texas Supreme Court has applied a similar analysis to the import process. In *Diamond Shamrock Refining & Marketing Co. v. Nueces County Appraisal District* the court held that oil imported directly to Texas was subject to local taxation while en route.[76] While recognizing that *Richfield* barred state taxes on goods in import transit, the Texas court concluded that this limitation "clearly applies only to goods in transit through the state to or from another state and not to goods merely in transit within the only state the goods ever enter."[77] It determined that the imported oil was not merely passing through Texas, because "[a]lthough still on its foreign import journey and in that

---

[73]    *Id.* at 525, 527.

[74]    504 F.2d 604, 606 (9th Cir. 1974).

[75]    *Id.* at 609.

[76]    876 S.W.2d 298, 304 (Tex. 1994).

[77]    *Id.* at 301.

sense 'in transit,' the oil in question here entered *only* the [s]tate of Texas."[78]  It had therefore ceased to be a tax-exempt import.

Similarly, under *Coe* the landing tax's constitutionality depends in part on whether fish product moving from the EEZ through Alaska territorial waters to an Alaska port is already moving interstate.[79]  It is true that the fish product originates outside Alaska, but it is also true that Alaska is the only state it will ever enter.  Unlike goods "merely passing through" multiple states on their way to export, the fish product in this case passes through no state but Alaska.  We thus conclude that transporting the fish product from the EEZ to the Alaska coast is only "partial preparation" to export it and does not commence export transit.[80]

> ### ii.    The fish product is committed to export transit only when it reaches the hold of a cargo vessel, and the landing tax is assessed before this occurs.

The fish product enters the stream of export commerce only when it reaches the hold of a foreign-flagged cargo vessel.  In finding otherwise the superior court relied largely on the "certainty of [the fish's] foreign destination."  But as the Supreme Court

---

[78]    *Id.* at 300-01 (emphasis in original).

One year later, in contrast, the Texas court struck down a tax on goods that had originated out of state and were "merely passing through" on their way to export. *Va. Indonesia Co. v. Harris Cty. Appraisal Dist.*, 910 S.W.2d 905, 910-15 (Tex. 1995). It explained that *Diamond Shamrock* had dealt with imported oil that "was not transported *to or from* another state," but had not reached "the issue of whether the import-export clause prohibits state taxation of goods passing through Texas on their way to a foreign country." *Id.* at 910 (emphasis in original) (citing *Diamond Shamrock*, 876 S.W.2d at 299-300). The court concluded that the goods originating out of state and passing through Texas were constitutionally protected from state taxation, but it did not upset its previous ruling. *Id.* at 914-15.

[79]    *See Coe*, 116 U.S. at 525.

[80]    *See id.*

has explained, such certainty is not enough; only physical commitment to the stream of export suffices.[81]

It has long been the rule that the intent of the would-be exporter is not dispositive, even if the goods were produced for or legally committed to export.[82] Articles intended for export are not "relieved from the prior ordinary burdens of taxation which rest upon all property similarly situated. *The exemption attaches to the export, and not to the article before its exportation.*"[83]

Goods become tax-exempt exports only when physically committed to export transport. In *Empresa Siderurgica v. County of Merced* a cement plant was sold to an overseas company, which took title and was preparing the plant for export when the state assessed a tax on it.[84] The Supreme Court rejected an Import-Export Clause challenge to the tax, explaining "it is not enough that there is an intent to export, or a plan which contemplates exportation, or an integrated series of events which will end with it."[85] Only physical commitment to export commerce confers tax exemption. The Court acknowledged that export was highly likely, but cautioned that this "prospect, no matter how bright, does not start the process of exportation."[86]

---

[81]     *See Kosydar v. Nat'l Cash Register Co.*, 417 U.S. 62, 71 (1974); *Empresa Siderurgica v. Cty. of Merced*, 337 U.S. 154, 157 (1949).

[82]     *See, e.g., Cornell v. Coyne*, 192 U.S. 418, 427 (1904) (determining state manufacturing tax was constitutionally levied on goods produced specifically for export).

[83]     *Id.* (emphasis added).

[84]     337 U.S. at 155.

[85]     *Id.* at 156-57.

[86]     *Id.* at 157; *see also Kosydar*, 417 U.S. at 70 (holding even the "practical certainty" of export for warehoused machines awaiting export was insufficient for tax

(continued...)

In keeping with this precedent we conclude that, as in *Richfield*, the fish product enters the stream of export only when it arrives on the cargo vessel which will take it out of the country.[87] Once the fish product reaches the cargo vessel's hold, it has been definitively committed to export, as the foreign-flagged ship cannot legally deliver it to a domestic market.[88] But before this occurs there remains a possibility that the fish product could be diverted, and so it is not yet an export.[89]

Finally, we conclude that the landing tax is assessed before the fish product has been definitely committed to export and gained tax exemption under the Import-Export Clause. Under the Alaska Administrative Code the tax applies "at the moment the act of landing begins."[90] "Landing" is statutorily defined as "the act of unloading or transferring a fishery resource."[91] The landing tax is thus triggered by the commencement, not the completion, of "the act of landing." But the fish product is not committed to export transit until it arrives on the cargo vessel, and by this time the tax has already been assessed.[92]

---

(...continued)
exemption).

[87]    *See Richfield Oil Corp. v. State Bd. of Equalization*, 329 U.S. 69, 82-83 (1946).

[88]    *See* 46 U.S.C. §§ 12102, 12103, 12112.

[89]    *See Richfield*, 329 U.S. at 83 ("[W]hen the oil was pumped into the hold of the vessel . . . there was nothing equivocal in the transaction which created even a probability that the oil would be diverted to domestic use.").

[90]    15 AAC 77.030.

[91]    AS 43.77.200(4).

[92]    The fish product first transported to refrigerated containers or dockside
(continued...)

We therefore conclude that the landing tax is permissible under *Richfield* as well as *Michelin* and does not violate the Import-Export Clause. We now turn to North Pacific's remaining claims.

**B.      The Landing Tax Does Not Violate The Tonnage Clause.**

North Pacific alternatively challenges the landing tax under the Tonnage Clause, which forbids states to "lay any Duty of Tonnage" on vessels,[93] or impose charges for "entering, trading in, or lying in a port," without congressional consent.[94] North Pacific argues that the landing tax is imposed directly on its vessels solely for their use of Alaska ports and navigable waters[95] and is thus unconstitutional. The superior court concluded that the tax violated the Import-Export Clause and thus did not reach this issue; because we conclude that the tax is permissible under the Import-Export Clause, we must also address North Pacific's Tonnage Clause arguments. We conclude that these fail as well.

---

[92]      (...continued)

storage is landed and taxed long before being committed to export transit in the cargo hold of a foreign vessel. We note that the closest question here is the fish product moved directly from a fishing vessel to a foreign cargo vessel, but conclude that beginning the landing process is still part of "an integrated series of events which will end with" the product's commitment to export. *See Empresa Siderurgica v. Cty of Merced*, 337 U.S. 154, 157 (1949) (stating that "an intent to export, . . . an integrated series of events which will end with" export, a contract for export, and completed export of other goods under same contract were inadequate to commit goods to export).

[93]      U.S. Const. art. I, § 10, cl. 3.

[94]      *Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n*, 296 U.S. 261, 263, 265-66 (1935).

[95]      North Pacific defines the term "ports" in this context as encompassing "all navigable waters." It therefore argues that the landing tax would violate the Tonnage Clause regardless of where in Alaska's territorial waters the fish product was unloaded.

The Tonnage Clause was intended to supplement the Import-Export Clause and Commerce Clause, preventing coastal states from indirectly taxing imports and exports by taxing the vessels used to transport them.[96]  Although the text of the clause prohibits only taxes based on "tonnage" — a vessel's cargo capacity[97] — it "has been deemed to embrace all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port."[98]

Like the Import-Export Clause, the Tonnage Clause should be read in light of its purpose:  to prevent coastal states from abusing their taxing power to disadvantage their landlocked neighbors.[99]  However it should not be construed so as to disadvantage the coastal states themselves by giving vessels and their owners "preferential treatment."[100]  It simply prohibits discriminatory taxes imposed specifically on vessels, which would effectively tax imports and exports to the detriment of landlocked states.

In keeping with this purpose, the Tonnage Clause does not bar all charges that might be imposed on vessels.[101]  Vessels may be taxed for general revenue purposes, provided the tax does not discriminate against vessels as such:  "in order to fund services

---

[96]    *See Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 6-7 (2009).

[97]    *Tonnage*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[98]    *Clyde Mallory Lines*, 296 U.S. at 265-66.

[99]    *Polar Tankers, Inc.*, 557 U.S. at 6-7.

[100]    *Id.* at 9 (citing *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 287 (1976)).

[101]    *Id.*

by taxing ships, a [s]tate must also impose similar taxes upon other businesses."[102] This similarity requirement discourages coastal states from indirectly taxing the citizens of neighboring states through discriminatory taxation of the import/export process. It also prevents the imposition of duties on vessels based strictly on tonnage or that operate as a charge solely for "entering, lying in, or trading in a port."[103]

In the Supreme Court's first Tonnage Clause case since 1935, it struck down a municipal property tax on large vessels using the port of Valdez.[104] The ships' values were closely correlated with their cargo capacity and the tax was imposed directly on the vessels, thus violating the Tonnage Clause.[105] The Court reiterated that the Clause was "not a ban on any and all taxes which fall on vessels."[106] But the Valdez tax ran afoul of the Tonnage Clause's text and purpose: it was imposed on vessels, was based on cargo capacity, was unlike any tax levied against other properties or businesses, and therefore was a discriminatory exercise of the taxing power injurious to interstate commerce.[107]

---

[102] *Id*. at 12.

[103] *See Clyde Mallory Lines*, 296 U.S. at 266.

[104] *Polar Tankers, Inc.*, 557 U.S. at 12 (plurality opinion).

[105] *Id.* at 10.

[106] *Id.* at 9 (emphasis omitted).

[107] *Id.* at 12-13. In cases with no majority, "the position taken by those Members who concurred in the judgments on the narrowest grounds" controls. *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). The concurrence in *Polar Tankers* would have barred a broader swath of taxes on vessels, 557 U.S. at 17 (Roberts, C.J., concurring), and the dissent would have upheld the tax. *Id.* at 20 (Stevens, J., dissenting). The plurality opinion has the narrowest reasoning and thus controls.

Unlike the Valdez tax, the landing tax is assessed on the fish product itself and is not a tax on vessels at all, putting it beyond the scope of the Tonnage Clause. Further, the tax does not conflict with the Clause's purposes. It does not create friction with other states or discriminate against vessels. We therefore hold that the landing tax does not violate the Tonnage Clause.

North Pacific argues that its activities in Alaska consist of "entering, trading in, or lying in a port," and that the landing tax must therefore fall unconstitutionally on its vessels for these activities. But North Pacific is subject to the landing tax because it operates a floating fisheries business, not because it enters Alaska ports as part of that business.[108] As North Pacific itself points out, the tax does not apply to other vessels "entering, trading in, or lying in" Alaskan ports, including those delivering fish to Alaskan processors or those that "simply transport the fish products through the state without unloading or transferring them." The landing tax is assessed on fish product first landed in Alaska by floating fisheries businesses, not on the component business activity of "entering and trading in" Alaska ports.[109]

---

[108]    AS 43.77.010; 15 AAC 77.005.

[109]    Similarly, in *Alaska v. Arctic Maid* the Supreme Court concluded that Alaska could tax the operation of freezer ships "in connection with Alaska's commercial fisheries" when the ships operated in the EEZ but processed fish taken in Alaska waters. 366 U.S. 199, 200, 205 (1961). The Court determined that the activities outside the state were components of the larger occupation being taxed and "practically inseparable" from the "series of local activities which the [s]tate can constitutionally reach." *Id.* at 203-04. The fishers were thus "engaged in business in Alaska when they operate their 'freezer ships,' " even when the ships themselves were operating outside the state. *Id.* at 203.

While *Arctic Maid* was a Commerce Clause challenge, the Court's refusal to artificially separate parts of a business operation taxed as a whole is instructive here. *See id*. at 203-04. North Pacific's commercial activities necessarily involve entering ports, but that is not the basis for the landing tax, and business operations do not become
(continued...)

North Pacific also argues that the landing tax, like the tax at issue in *Polar Tankers*, discriminates against vessels. But unlike a property tax imposed only on large ships, the landing tax mirrors similar taxes imposed on all participants in the fish processing business, including those that operate only on land. It is "designed and intended to . . . complement the fisheries business tax"[110] which is imposed on all entities processing fish within Alaska, both on-shore and off-shore.[111] The landing tax does not impose a disproportionate tax rate on EEZ catcher/processors like North Pacific — to the contrary, they are taxed at an equal or lower rate than the rest of the commercial fishing industry.[112] Alaska is meeting its obligation to "also impose similar taxes upon other businesses."[113]

North Pacific's reading of the Tonnage Clause would expand it from protecting vessels and their owners from discrimination to giving them "preferential treatment vis-à-vis all other property, and its owners, in a seaboard [s]tate."[114] This is precisely what the Supreme Court cautioned against in *Polar Tankers*. As the Department points out, it is difficult to imagine what activities using or pertaining to vessels would remain taxable under this theory: virtually all of them involve entering,

---

(...continued)
exempt from taxation simply because one component would be individually untaxable.

[110]    15 AAC 77.005(a).

[111]    AS 43.75.015, 43.75.100.

[112]    *Compare* AS 43.75.015, *with* AS 43.77.010.

[113]    *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 12 (2009) (plurality opinion).

[114]    *Id.* at 9.

trading in, or lying in ports or navigable waters and by North Pacific's argument would consequently be exempt from taxation.

The landing tax is not imposed on North Pacific's vessels or on the act of entering, trading in, or lying in Alaska's ports, nor does it discriminate against vessels or impede commerce. We therefore conclude that it does not violate the Tonnage Clause.

## C. The Landing Tax Does Not Violate 33 U.S.C. § 5(b).

Finally, North Pacific claims that the landing tax violates 33 U.S.C. § 5(b), which prohibits non-federal taxation of vessels for operating on navigable waters. The superior court did not reach this issue; having determined that the tax is constitutional, we now must do so. And for the same reasons the landing tax does not violate the Import-Export or Tonnage Clause, we conclude that it does not violate 33 U.S.C. § 5(b).

In relevant part, 33 U.S.C. § 5(b) prohibits non-federal entities from levying "taxes . . . or any other impositions whatever" on "any vessel . . . or its passengers or crew . . . if the vessel or water craft is operating on any navigable waters subject to the authority of the United States . . . ." This language echoes the Tonnage Clause prohibition against taxing vessels as vessels, or solely for their use of ports and navigable waters. Importantly § 5(b) does not prohibit taxes on things other than vessels, passengers, and crews.[115]

Legislative history indicates that § 5(b) was also meant to codify Commerce Clause common law: as a sponsor of the bill explained, it was intended to prohibit state or local taxes from being imposed "on vessels merely transiting or making innocent

---

[115] 33 U.S.C. § 5(b); *see also CSX Transp., Inc. v. Ala. Dep't of Revenue*, 888 F.3d 1163, 1184 (11th Cir. 2018); *Commercial Barge Line Co. v. Dir. of Revenue*, 431 S.W.3d 479, 484 (Mo. 2014) (en banc) ("[Taxpayers'] argument fails to consider what the state is actually taxing. Missouri is not taxing the barges, towboats, or their crews. Rather, it is assessing sales and use tax on the goods and supplies delivered to the Taxpayers' towboats while they are in Missouri.").

passage through navigable waters . . . adjacent to the taxing community . . . . In most instances, these types of taxes would not be allowed under the Commerce Clause of the United States Constitution."[116] Courts therefore consider whether a tax challenged under § 5(b) discriminates against interstate commerce as well as whether it is imposed on vessels, passengers, or crews.[117] For example, a Hawaii court upheld the application of a tax on business receipts to a charter fishing boat company.[118] The state's business tax was not imposed on vessels, did not discriminate against vessels, and was not levied against vessels for "merely transiting or making innocent passage" through Hawaiian waters.[119] It was therefore not barred under § 5(b).

In contrast, in *State, Department of Natural Resources v. Alaska Riverways, Inc.* we struck down a purported rental fee assessed on a per-passenger basis for a tour boat operator's use of state-owned river banks.[120] As the per-passenger fee was unrelated to the rental value of the land being used, it functioned as "a charge exacted specifically

---

[116] 148 CONG. REC. 2,143 (2002) (statement of Rep. Young); *see also* H. R. REP. No. 107-777, at 1 (2002) (Conf. Rep.).

[117] *See State, Dep't of Nat. Res. v. Alaska Riverways, Inc.*, 232 P.3d 1203, 1222 (Alaska 2010) (explaining that § 5(b), "like the Commerce and Tonnage Clauses, prohibits levying fees on the use of navigable waters unless those fees do not impose a significant burden on interstate commerce"); *Reel Hooker Sportfishing, Inc. v. State, Dep't of Taxation*, 236 P.3d 1230, 1235-36 (Haw. App. 2010); *Lil' Man In The Boat, Inc. v. City & Cty. of San Francisco*, No. 17-cv-00904-JST, 2019 WL 8263440, at *8-9 (N.D. Cal. Nov. 26, 2019).

[118] *Reel Hooker Sportfishing, Inc.*, 236 P.3d at 1234-36.

[119] *Id.* at 1235 (quoting 148 CONG. REC. 2,143 (2002)).

[120] 232 P.3d at 1222-23.

for the use of navigable waters."[121]  We concluded that it thus violated § 5(b)'s prohibition on taxing vessels or their passengers.

North Pacific argues that the landing tax, like the per-passenger fee, operates as a charge on the use of navigable waters and thus violates 33 U.S.C. § 5(b). The Department responds that the tax is not on vessels, passengers, or crews and is assessed on an entirely independent basis:  the value of the unprocessed fish caught by North Pacific and converted into frozen fish product.

We agree with the Department.  The landing tax is not imposed on the vessels or their passengers or crew, nor "exacted specifically for the use of navigable waters."[122]  Unlike the rental fee we previously rejected, the tax is assessed on an activity separate from the vessels or crew and rationally linked to the impact of that activity on state resources.  The landing tax is not opportunistic taxation of vessels "merely transiting" adjacent waters without landing or benefitting from any local services.  Nor does it impermissibly burden or discriminate against interstate commerce.  The landing tax does not violate the Import-Export or Tonnage Clauses, and for the same reasons we conclude that it does not violate § 5(b).

North Pacific's argument would drastically expand § 5(b)'s reach. It claims that even if the landing tax is not imposed on vessels, it applies only to activities involving vessels, and the Department "provides no explanation of how a vessel can engage in [landing fish product] within Alaska without using its navigable waters." But again North Pacific does not explain how any activity involving vessels could be taxed without violating § 5(b) under this theory.  Its suggested interpretation would go beyond

---

[121]    *Id.* at 1221.

[122]    *Id.*

the statute's text, stated purpose, and the constitutional principles it expresses. We reject North Pacific's 33 U.S.C. § 5(b) challenge along with its constitutional claims.

## V. CONCLUSION

We conclude that the landing tax does not violate the Import-Export Clause, the Tonnage Clause, or 33 U.S.C. § 5(b). We therefore REVERSE the superior court's decision and AFFIRM the decision of the Office of Administrative Hearings.