2023 IL App (1st) 211371

No. 1-21-1371

Second Division
March 14, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| WENDELLA SIGHTING COMPANY, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF CHICAGO, a Municipal | ) | No. 2019 CH 3022 |
| Corporation, Through Its Department of | ) | |
| Finance, | ) | Honorable |
| | ) | John J. Curry, Jr., |
| Defendant-Appellant. | ) | Judge, presiding |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Ellis concurred in the judgment
and opinion.*

**OPINION**

¶ 1     This case is a continuation of an ongoing dispute between the City of Chicago (City) and

Wendella Sightseeing, Inc. (Wendella). The subject of the dispute is whether the City may impose

a form of an amusement tax on Wendella, a sightseeing boat tour company. In *City of Chicago v.*

*Wendella Sightseeing, Inc.*, 2019 IL App (1st) 181428 (*Wendella I*), we held that the City's prior

_____

*Oral argument was held in this case via Zoom technology. Justice Ellis did not participate in the
live oral argument, but listened to the full recording thereafter, in addition to reviewing the parties' briefs
and otherwise participated in deliberations.

existing version of its amusement tax ordinance, as applied to Wendella, was preempted by and thus violated the federal Rivers and Harbors Appropriation Act of 1884 (RHA), as amended at 33 U.S.C. § 5(b) (2018). The City has since amended its amusement tax ordinance specifically to assess a tax on "tour boat operators." Wendella challenged this new tax in the circuit court of Cook County and argued that, even as amended, the tax was still preempted. In response to the parties' cross-motions for summary judgment, the circuit court ruled that the amended version of the amusement tax was also preempted by federal law. The City appeals that ruling, and for the following reasons, we affirm.

¶ 2                                I. BACKGROUND

¶ 3                        A. Initial Litigation—*Wendella I*

¶ 4       The factual background underlying this case stems from *Wendella I*, 2019 IL App (1st) 181428. For historical context, we incorporate the facts of that here.

¶ 5                                1. The RHA

¶ 6       The federal statute at issue in *Wendella I* and here in this appeal is an amendment to the RHA (33 U.S.C § 1 *et. seq.* (2018)). We begin briefly with the language of the RHA, which provides that the United States Secretary of the Army is charged with responsibility for the "use, administration, and navigation of the navigable waters of the United States." *Id.* § 1. As a whole, the statute provides a comprehensive scheme defining impermissible and permissible uses and activities related to the federal waterway system.

¶ 7       Section 5(b) was added to the RHA in 2002 and 2003 primarily through the passage of the Maritime Transportation Security Act of 2002, Pub. L. No. 107-295, 116 Stat. 2133 (MTSA). See 33 U.S.C. § 5(b) (2018). Its current form governs the limited circumstances in which a local tax or

fee may be levied against a vessel, its passengers, or its crew on federal navigable waters.[1] Section 5(b) provides, in relevant part:

> "No taxes, tolls, operating charges, fees, or any other impositions whatever shall be levied upon or collected from any vessel or other water craft, or from its passengers or crew, by any non-Federal interest, if the vessel or water craft is operating on any navigable waters subject to the authority of the United States, or under the right to freedom of navigation on those waters, except for—
>
>> (1) fees charged under section 2236 of this title;
>>
>> (2) reasonable fees charged on a fair and equitable basis that—
>>
>>> (A) are used solely to pay the cost of a service to the vessel or water craft;
>>>
>>> (B) enhance the safety and efficiency of interstate and foreign commerce; and
>>>
>>> (C) do not impose more than a small burden on interstate or foreign commerce; or
>>
>> (3) property taxes on vessels or watercraft, other than vessels or watercraft that are primarily engaged in foreign commerce if those taxes are permissible under the United States Constitution." *Id.*

¶ 8                                   2. General Background

---

[1]The RHA has been amended numerous times since its original passage. Our research shows that various state and federal courts that have interpreted it refer to the statute and its 2002 amendment interchangeably as the "RHA" and the "MTSA." For purposes of convenience, we refer to the entire statute and its recent amendments, collectively, as the "RHA" and more specifically as "section 5(b)."

¶ 9      Wendella operates sightseeing boat tours exclusively on Lake Michigan and the Chicago River. Between July 1, 2006, and June 30, 2013, Wendella sold tickets for its boat tours at its ticket offices at the Wrigley Building, as well as online and at kiosks near Wendella's city-leased dock on Michigan Avenue. No tickets were sold onboard Wendella's tour boats. For decades, Wendella paid license fees to the City for the right to operate and charter its tour boats and water taxis from the dock.

¶ 10                          3. The City Amends Its Amusement Tax

¶ 11      In 2008, the City amended its amusement tax ordinance, codified at section 4-156-020 of its municipal code (Chicago Municipal Code § 4-156-020 *et seq.* (amended at Chi. City Clerk J. Proc. 48243 (Nov. 19, 2008))). Section 4-156-020(A) provided that:

> "Except as otherwise provided by this article, an amusement tax is imposed upon the patrons of every amusement within the city. The rate of the tax shall be equal to nine percent of the admission fees or other charges paid for the privilege to enter, to witness, to view or to participate in such amusement ***." *Id.* § 4-156-020(A).[2]

¶ 12      "Amusement" was defined, in relevant part, as "(1) any exhibition, performance, presentation or show for entertainment purposes, including *** riding on animals or vehicles." Chicago Municipal Code § 4-156-010 (amended at Chi. City Clerk J. Proc. 14999 (Nov. 13, 2007)). "Patron" was defined as "a person who acquires the privilege to enter, to witness, to view or to participate in an amusement." Chicago Municipal Code § 4-156-010 (amended at Chi. City Clerk J. Proc. 15814 (Nov. 13, 2007)). The amended ordinance required "every owner, manager

---

[2]This section of the ordinance has been amended since, but the subsequent amendments have no applicability to the issues before us today.

or operator of an amusement *** to secure from each patron the [amusement tax] and to remit the tax to the [City's] department of revenue." *Id.* § 4-156-030(A).

¶ 13    Beginning in 2013, the City audited Wendella with respect to several taxes, including the 2008 amended amusement tax. During the audit, Wendella informed the City that it did not believe that the City was authorized to impose or collect the amusement tax from Wendella or its passengers because the tours were operated on federal waterways and thus expressly preempted by section 5(b) of the RHA.

¶ 14    In October 2014, Wendella received an assessment from the City for approximately $3.2 million in amusement taxes and interest for the period beginning July 1, 2006, through June 30, 2013. Wendella filed a protest in the City's Department of Administrative Hearings (DOAH). Both parties filed cross-motions for summary judgment, with Wendella arguing, among other things, that federal law preempted the imposition of the amusement tax on Wendella.

¶ 15    On May 16, 2017, the administrative law judge issued a decision, holding that section 5(b) of the RHA preempted the City's amusement tax as applied to Wendella. The City challenged the DOAH's decision in the circuit court of Cook County. On March 15, 2018, the circuit court affirmed the DOAH's decision.

¶ 16    The City appealed the circuit court's decision to this court in *Wendella I*, 2019 IL App (1st) 181428, ¶ 26, arguing that the DOAH had erred by finding that section 5(b) preempted the amusement tax. The City reasoned that there was no conflict between the amusement tax and federal law because the tax was levied on a ticket purchased on dry land while the boat was docked and before the tour ever began. *Id.* The City interpreted the RHA as only prohibiting nonfederal taxes on vessel operations that were "present" and "ongoing." *Id.* The City also contended that

section 5(b) only prohibited taxes on "passengers" of a vessel, but not "patrons" as defined within the amusement tax. *Id.* ¶ 31.

¶ 17    We rejected the City's interpretation of section 5(b), and ultimately found that there was conflict preemption between the federal statute and the local ordinance. *Id.* ¶¶ 27, 29. Initially, we interpreted the plain meaning of section 5(b), and held that the dictionary definition of "operating" equated to "engaging in active business," and thus, a vessel was "operating" on federal waters when it was "engaged in active business." *Id.* ¶ 28. We reasoned that Wendella's operations did not cease simply because the boat was docked, as that would be equivalent to saying a "business [was] no longer in operation simply because it closes at the end of the day." (Internal quotation marks omitted.) *Id.*

¶ 18    Further, we noted that, even if we agreed with the City that the boats were not actively operating on federal waters at the time the tax was levied, *i.e.* when a ticket was purchased on dry land, the language of section 5(b) was constructed in both the present and future tense. *Id.* ¶ 29. Thus, we determined that the statute prohibited taxes on Wendella's vessels, or their passengers and crews, regardless of whether they were currently operating or were going to operate in the future. *Id.* Accordingly, we held that section 5(b) conflicted, and thus preempted, the amusement tax. *Id.* ¶¶ 29, 32.

¶ 19    We also found the City's distinction between "passengers" and "patrons" unavailing. *Id.* ¶ 31. We observed that the amusement tax defined "patron" as a "person who *** acquires the privilege to enter, to witness, to view or to participate in an amusement." (Internal quotation marks omitted.) *Id.* Thus, Wendella's "patrons" were synonymous with "passengers" as defined in section 5(b) because Wendella's "patrons" were people who acquired the privilege to "enter" its tour boats and therefore became "passengers" as contemplated under section 5(b). *Id.*

¶ 20                  4. Amended Amusement Tax as Applied to Tour Boat Operators

¶ 21     In or around November 2016, while Wendella's protest was pending before the DOAH, the City amended and enacted its amusement tax by adding a new section directed at tour boat operators (tour boat operator tax).[3] Chicago Municipal Code § 4-156-032 (added at Chi. City Clerk J. Proc. 38042 (Nov. 16, 2016)). The since amended section 4-156-032 of the Chicago Municipal Code provides in relevant part:

> "Alternative Tax imposed on tour boat operators.
>
> A. A tax is imposed upon *all persons engaged in the business of operating tour boats in the City*. The rate of this tax shall be nine percent of *the charges paid to the tour boat operator* for amusements *provided by the tour boat operator in the City*. For the purposes of this Section \*\*\*, the *term 'tour boat' shall mean any vessel or other water craft on which amusements take place*, as the term "amusement" is defined in Section 4-156-010. Charges that are excluded, or that are fully or partially exempt, from the tax imposed by Section 4-156-020 shall also be excluded, or fully or partially exempt, from the tax imposed by this Section \*\*\*."
>
> B. A tour boat operator that has paid or remitted the tax imposed by Section 4-156-020 in connection with the same transactions that are subject to subsection A of this section shall be entitled to a credit for such tax paid or remitted against the amount of tax owed under subsection A of this section. The tour boat operator shall have the burden of proving its entitlement to this credit with books, records and other documentary evidence."
>
>       \*\*\*

---

[3]The City also amended several sections of its amusement tax ordinance prior to the circuit court's resolution of the instant matter. We recite the totality of the amendments here.

D. The tax imposed by this section shall not apply to any person, activity or privilege that under the Constitution or statutes of the United States, or the constitution or statutes of the State of Illinois, may not be made the subject of taxation by the City.

E. The intent of this Section 4-156-032 is that the total amount of amusement tax paid by a tour boat operator will be the same as it would have been had the tour boat operator collected and remitted the tax imposed by Section 4-156-020. As used in subsection A of this Section 4-156-032, the terms 'exempt' and 'excluded' refer to those exemptions and exclusions set forth in Section 4-156-020 and do not include preemption by federal or state law. The intent of this subsection E is to confirm rather than change the intent of Section 4-156-032 since it was added to the Code effective January 1, 2017." (Emphases added.) Chicago Municipal Code § 4-156-032(A), (B), (D), (E) (amended Apr. 24, 2020)).

¶ 22    Section 4-156-010 defines "Operator," in relevant part, as:

"any person who sells or resells a ticket or other license to an amusement for consideration or who, directly through an agreement or arrangement with another party, *collects the charges paid for the sale or resale of a ticket or other license to an amusement*. The term includes, but is not limited to, persons engaged in the business of selling *** tickets *** to amusements, whether on-line, in person or otherwise." (Emphasis added.) Chicago Municipal Code § 4-156-010 (amended May 25, 2022).[4]

¶ 23    Section 4-156-010 also defines "Owner" as, in relevant part: "(1) with respect to the owner of a place where an amusement is being held, *any person with an ownership *** interest* in a

_____

[4]Although this section was amended in 2022, these amendments did not change the definition set forth herein and continuing thereafter.

building, structure, vehicle, *boat*, area or other place who presents, conducts or operates an amusement." (Emphases added.) *Id*. The same section defines "person" as "any natural individual, firm, society, foundation, institution, partnership, limited liability company, association, joint stock company, joint venture, public or private corporation, receiver, executor, trustee or other representative appointed by the order of any court, or any other entity recognized by law." *Id.*

¶ 24    "Charges paid" is defined as the "*gross amount of consideration paid for the privilege to enter, to witness, to view or to participate in an amusement*, valued in money, whether received in money or otherwise, including cash, credits, property and services" and included "*any and all charges that the patron pays incidental to obtaining the privilege to enter *** including but not limited to any and all related markups, service fees, convenience fees, facilitation fees, cancellation fees and other such charges, regardless of terminology." (Emphasis added.) *Id.* "Charges paid" did not include "charges that are added on account of the tax imposed by this chapter." *Id.*

¶ 25    Some time prior to February 2019, Wendella communicated to the City its intent to the improve its dock on the Chicago River and also requested a 10-year extension to its current lease. On February 1, 2019, the City, through its Department of Transportation, responded by a letter to Wendella. The City indicated that it was "amenable to the proposed improvements *** [and] an extension of [the] license agreement," but asserted that it could not approve the plans "while Wendella has outstanding unpaid Amusement tax[es]." The City stated that Wendella owed taxes, plus interest, from January 1, 2017, to the present.

¶ 26                                    5. *Wendella II*

¶ 27    In response to the City's February 2019 letter, on March 7, 2019, Wendella filed a six-count complaint for declaratory and injunctive relief against the City in the circuit court of Cook County. Count I sought a declaration that the tour boat operator tax was facially "null and void,"

as it sought to impose the same tax on Wendella that was found to be preempted in *Wendella I*. Count II sought a declaration that the tax violated and was preempted by section 5(b) of the RHA. Counts III through VI alleged that the tax violated article VII, section 6(e), of the Illinois Constitution (Ill. Const. 1970, art. VII, § 6(e)); the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, § 2); the equal protection clauses of the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2); and section 1983 of the Civil Rights Act of 1871 (42 U.S.C. § 1983 (2018)).

¶ 28    On May 6, 2019, the City filed a motion to dismiss all counts of the complaint pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2018)), arguing, *inter alia*, that section 5(b) of the RHA did not preempt the tour boat operator tax.[5] Following briefing, on November 7, 2019, the circuit court issued a written order denying the City's motion as to all counts except count V, for failure to state a claim. On December 4, 2019, the City filed an answer to the complaint. Thereafter, the parties filed cross-motions for summary judgment.

¶ 29                6. Cross-Motions for Summary Judgment

¶ 30    In its motion, Wendella argued, *inter alia*, (1) the plain language of the tour boat operator tax rendered it null and void, (2) the City was not authorized to impose the tax because it violated and was preempted by section 5(b) of the RHA, (3) the tax was an unauthorized occupation tax, and (4) the tax violated the uniformity clause of the Illinois Constitution and the equal protection clauses of the federal and state constitutions.

¶ 31    As the circuit court solely ruled on the preemption arguments, we recite those arguments in full. Preliminarily, Wendella asserted that there was no dispute that Lake Michigan or the

---

[5]The matter was initially filed in the general chancery division and then, by agreed order, transferred to the miscellaneous tax and remedies section of the law division.

Chicago River were federally navigable waters under the RHA. Additionally, Wendella stated that *Wendella I* had already found that section 5(b) preempted the general amusement tax contained in section 4-156-020 of the Chicago Municipal Code, and thus the same reasoning applied to the tour boat operator tax, regardless of whether the tax was imposed on the patron or on the tour boat operator. Wendella reasoned that a tax on the vessel's owner was "inseparable" from a tax on the vessel itself, because, practically speaking, a vessel could not pay its own taxes. Wendella further contended that the tour boat operator tax was not comparable to permissible taxes such as sales taxes or taxes on goods sold on boats or vessels.

¶ 32    The City filed a joint response and cross-motion for summary judgment. Initially, the City contended that *Wendella I*'s holding was limited to the term "patrons" within its previous version of the amusement tax and did not limit the City's ability to tax tour boat operators. Next, the City observed that, in the context of state taxation, Congress's intent to preempt a local tax had to be "unmistakably clear" and balanced against the presumption that Congress did not intend to supplant state law, a burden that Wendella was required to overcome. The City argued that the MTSA, an amendment to the RHA, was intended to only prohibit fees and tolls on vessels and passengers that were "passing through" on federally navigable waters and was not clear as to whether local commercial sales transactions were preempted, citing the MTSA's legislative history and a case from Hawaii, *Reel Hooker Sportfishing, Inc. v. Department of Taxation*, 236 P.3d 1230 (Haw. Ct. App. 2010), in support. The City characterized the tour boat operator tax as one imposed for the privilege of offering an amusement within the city and reasoned that just because the amusement occurred on a boat did not mean that the tour boats were now "vessels" as contemplated by section 5(b), citing an unpublished federal slip opinion, *Lil' Man in the Boat, Inc. v. City & County of San Francisco*, No. 17-cv-00904-JST, 2019 WL 8263440 (N.D. Cal. Nov. 26, 2019), in

support. The City also offered other characterizations of the tax, indicating that it was an "alternative" to the general amusement tax, as well as a permissible "complementary" tax.

¶ 33    Wendella filed a joint reply to its motion for summary judgment and response to the City's motion. Wendella argued that the City's interpretation of section 5(b) was not supported by its plain language and that the vessel did not have to be engaged in interstate commerce to fall within its ambit. Wendella also pointed out that section 5(b) contained express exceptions for permissible taxes and fees, of which the City had not argued applied to its tax. Wendella reiterated that the tour boat operator or owner was the representative of the vessel for purposes of paying taxes pursuant to the federal Tonnage Clause (U.S. Const., art. I, § 10, cl. 3). Wendella characterized the new tax as issuing an ultimatum to tour boat operators—either collect an illegal tax from passengers or pay it themselves. Finally, Wendella maintained that the statute's meaning was clear, but assuming legislative history was to be considered, the City's interpretation was still incorrect as the statute was meant to prohibit more than taxes and fees on simple transit.

¶ 34    In its reply, the City reiterated that its tax was levied on the business and not the vessel. The City reasoned that if the tour boat operator decided to use its vessels for any other purpose, such as carrying freight, then the tax would not apply. As to Wendella's point that the tax essentially still fell on the consumer, the City retorted that the tour boat operator was still legally responsible for the tax, even if it tried to pass it along to its consumers.

¶ 35                                7. Circuit Court Ruling

¶ 36    On March 15, 2021, the circuit court heard oral argument on the parties' cross-motions and took the matter under advisement. On June 23, 2021, the court issued a written order, granting Wendella's motion for summary judgment as to the preemption argument. The court did not address the remaining claims and arguments raised in the briefs.

¶ 37 The court initially observed that, as admitted by the City, the tour boat operator tax was enacted as an alternative "precaution" in the event that the general amusement tax in *Wendella I* was found to be preempted. The court further noted that neither party disputed that the Chicago River and Lake Michigan were navigable waters pursuant to section 5(b). Finally, the court identified the issue as one of first impression.

¶ 38 The court examined the plain language of section 5(b), beginning with the term "vessel." According to the court, federal courts had interpreted the term to mean not only the vessel itself, but its "master" and "owner" pursuant to the Tonnage Clause of the federal constitution. As such, taxes on vessel owners and ship captains were considered to be taxes on the vessels because those individuals were considered to be the ship's representatives. The court further observed that, when passing the MTSA in 2002 to amend the RHA, Congress "drafted [the amendment] in light of the Tonnage Clause precedents."

¶ 39 Next, the court agreed with the City that any preemption analysis began with the presumption that preemption is generally disfavored. Nevertheless, the court found that section 5(b) was clear in its intent to "expressly preempt state and local law on the matter of taxation," and that it was even more "patently clear" that Congress sought to prohibit "taxation of vessels, passengers, and crews on navigable waters." The court acknowledged that there was "little authority" to determine whether the statute solely sought to prohibit taxes on vessels themselves and nothing more, or if it allowed for an "indirect" tax on them. However, given Tonnage Clause progeny, the court determined that a tax on a representative of a vessel would also constitute a tax on the vessel, and that any contrary interpretation would render the statute "rather toothless, indeed meaningless," and thus "contrary to the express wishes of Congress."

¶ 40     Finally, the court examined the small body of case law interpreting section 5(b), noting that there appeared to be two permissible categories of taxes that would not run afoul of the statute. One was a tax related to "some service or access *** or some benefit conferred [on the vessel] by the local authority," such as "charges for docking, loading, harboring, and mooring," and the other was a general tax on businesses, such as business franchise taxes, excise taxes, and sales and income taxes. The court determined that the City's tax did not fall into either of those categories, as it was specifically targeted at the tour boat industry. The court also rejected the City's urging to classify the tax as a simple amusement tax, given that Wendella's tour boats operated entirely on federally navigable waters and that the amusement was the transit itself. Ultimately, the court determined that a tax on a tour boat operator was a tax on the vessel because it was, at minimum, an indirect tax on a representative of the vessel and thus was preempted by section 5(b).

¶ 41     On July 19, 2021, the City timely filed a motion for reconsideration. On October 8, 2021, the court denied the City's motion in a brief written order.[6] This appeal followed.

¶ 42                              II. ANALYSIS

¶ 43                         A. Standard of Review

¶ 44     The parties do not dispute that the standard of review is *de novo. Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 28. Here, the parties filed cross-motions for summary judgment, in which "they agree that only a question of law is involved and [thus] invite the court to decide the issues based on the record." *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. Further, the sole issue on appeal, whether section 5(b) preempts the tour boat operator tax, is a matter of statutory construction and therefore also a question of law reviewed *de novo. In re Estate of*

---

[6]The record does not contain a transcript of the October 7, 2021, oral argument.

*Gagliardo*, 391 Ill. App. 3d 343, 346 (2009). This principle is applicable not only to statutes but also to municipal ordinances. *Scott v. City of Chicago*, 2015 IL App (1st) 140570, ¶ 11.

¶ 45                    B. Whether Section 5(b) Preempts the Tour Boat Operator Tax

¶ 46    On appeal, the City argues that Section 5(b) does not preempt its tax. Wendella disagrees and contends that the amended ordinance simply attempts to tax the same thing already found to be preempted in *Wendella I*, only now placing the tax burden on the vessel's operator, rather than its patron. However, contends Wendella, this is a distinction without a difference, as the tax burden still falls on the vessel.

¶ 47    We begin with the parameters of a preemption analysis. The preemption doctrine emanates from the supremacy clause of article VI of the United States Constitution. *Wendella I*, 2019 IL App (1st) 181428, ¶ 23. The supremacy clause provides, in pertinent part, that the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. A state law may be null and void if it conflicts with federal law. *Wendella I*, 2019 IL App (1st) 181428, ¶ 23.

¶ 48    Our answer to whether the tour boat operator tax is preempted by federal law begins with the acknowledgement of the "two cornerstones of our pre-emption jurisprudence." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.' " *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Second, where Congress has chosen to legislate in a field where the States have traditionally occupied, we must be mindful that " ' "the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress." ' " *Id.*

- 15 -

(quoting *Lohr*, 518 U.S. at 485, quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

¶ 49    "Federal law preempts state law under the supremacy clause in any one of the following three circumstances: (1) express preemption—where Congress has expressly preempted state action; (2) implied field preemption—where Congress has implemented a comprehensive regulatory scheme in an area, thus removing the entire field from the state realm; or (3) implied conflict preemption—where state action actually conflicts with federal law." (Internal quotation marks omitted.) *Wendella I*, 2019 IL App (1st) 181428, ¶ 25. "A presumption exists in every preemption case that Congress did not intend to supplant state law." *Id.* ¶ 24. "This presumption against federal preemption applies with special force when a matter of primary state responsibility, such as local taxation, is at stake." *Id.* "Therefore, there is no federal preemption of a state or local tax unless Congress makes its intent to preempt unmistakably clear in the language of the [federal] statute." *Id.* "The party asserting federal preemption has the burden of persuasion." *Id.* ¶ 23.

¶ 50    Initially, we observe that neither party expressly argues which type of preemption applies, and the circuit court did not do so either. We note that in *Wendella I*, the City argued that the DOAH had erred in finding "implied conflict preemption," with which we disagreed when finding that section 5(b) "was in conflict with *** the amusement tax ordinance." *Id.* ¶¶ 29-30. Although both parties argue that the plain language of the statute dictates resolution in their favor, neither has directly contended that Congress has *expressly* preempted state action by enacting section 5(b). Further, because the parties agree that *certain* types of taxes can be levied on a vessel, we can glean from the substance of their arguments that this appeal concerns implied conflict preemption, where certain state action conflicts with federal law and is therefore impermissible.

¶ 51   Resolution of whether there is implied conflict preemption here requires interpretation of constitutional provisions, federal statutes, and local ordinances. It is well-established that, when interpreting and construing the meaning of these statutes, our objective is to ascertain and give effect to its legislative intent. *Id.* ¶ 27. To determine legislative intent, we begin with the plain and ordinary meaning of the statute, which is its best indicator. *Tillman v. Pritzker*, 2021 IL 126387, ¶ 17. Clear and ambiguous language will be given effect as written, without resort to other aids of statutory interpretation. *Id.* Only if a statute is determined to be ambiguous should a statute's legislative history and debates be utilized to ascertain its meaning. *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 397-398 (2003).

¶ 52   Finally, we note that, with the exception of *Wendella I*, the issue underlying this appeal appears to be one of first impression in Illinois, as well as throughout the country, as section 5(b) was only recently amended in 2002 and 2003. See *Kittatinny Canoes, Inc. v. Westfall Township*, No. 183 CV 2013, 2013 WL 8563483, at *14 (Pa. Ct. Comm. Pl. May 6, 2013) ("[A] dearth of case law exists interpreting or otherwise analyzing 33 U.S.C. § 5."). Because our analysis involves interpretation of the RHA, a federal statute, and tangentially, the tonnage clause as contained within our federal constitution, we may look to "decisions of the United States Supreme Court and federal circuit and district courts" for guidance. *State Bank of Cherry v. CGB Enterprises, Inc.*, 2013 IL 113836, ¶ 33; see *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 141-142 (2006). In the absence of a binding United States Supreme Court decision, "the weight [that we] give[ ] to federal circuit and district court interpretations of federal law depends on factors such as uniformity of law and the soundness of the decisions." *State Bank of Cherry*, 2013 IL 113836, ¶ 33. Ultimately, "uniformity of the law continues to be an important factor in deciding how much deference to afford federal court interpretations" and thus, "in the interest of preserving unity," we will give

"considerable weight to those courts' interpretations of federal law and find them to be highly persuasive." (Emphasis omitted.) *Id.* ¶ 35. "However, if the federal courts are split, we may elect to follow those decisions we believe to be better reasoned." *Id.*

¶ 53                                    1. The Tonnage Clause

¶ 54    We begin chronologically with the tonnage clause because, as our research has revealed, its progeny provides context for our eventual interpretation of section 5(b). The tonnage clause of the federal constitution provides that "[n]o State shall, without the consent of Congress, lay any Duty of Tonnage." U.S. Const., art. I, § 10, cl. 3. The tonnage clause was envisioned to work in tandem with the import-export clause of the federal constitution, which generally prohibits states from taxing imports and exports. See U.S. Const., art. I, § 10, cl. 2; see also *Maher Terminals, LLC v. Port Authority of New York & New Jersey*, 805 F.3d 98, 106 (3d Cir. 2015). Specifically, the import-export clause sought to prevent states with convenient ports from taxing goods in commerce at the expense of consumers in less-fortunately located states. *Maher Terminals, LLC*, 805 F.3d at 106. In turn, the tonnage clause was adopted to avoid the possibility that states could effectively "nullify" the import-export clause by taxing the privilege of access to their vessels, and to further restrain states from obtaining " 'geographical vessel-related tax advantages.' " *Id.* (quoting *Polar Tankers, Inc. v. City of Valdez, Alaska*, 557 U.S. 1, 7 (2009)).

¶ 55    Thus, the United States Supreme Court has interpreted the tonnage clause to prohibit more than just "classic" tonnage duties, such as taxes on a ship based on its capacity. *Id.* Examples of prohibited taxes include taxes on the number of masts, mariners, or passengers, as well as taxes "imposed not just on the vessel itself but *also on the ship captain, owner, supercargo (the person in charge of the cargo on the ship), and passengers*." (Emphasis added.) *Id.* at 106-107. Further, the Tonnage Clause has even been extended to prohibit flat taxes on a ship, *i.e.* those that do not

vary according to tonnage but are intended to charge for the "privilege of entering, training in, or lying in a port." (Internal quotation marks omitted.) *Id.* at 107; see *Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n*, 296 U.S. 261, 265-266 (1935) (the clause prohibits "all taxes and duties regardless of their name or form, and even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port").

¶ 56    However, the tonnage clause "does not extend to charges made by state authority *** for services rendered to and enjoyed by the vessel." *Clyde Mallory Lines*, 296 U.S. at 266. For example, charges for "services rendered or for conveniences provided" have not been considered a tax or duty. *Packet Co. v. Keokuk*, 95 U.S. 80, 84-85 (1877); see also *Maher Terminals, LLC*, 805 F.3d at 106 (tonnage duties are different from fees for services facilitating commerce). These charges have been deemed constitutional because they are considered more akin to taxes on property, are "demands for reasonable compensation," and they "facilitate, rather than impede, commerce." *Maher Terminals, LLC*, 805 F.3d at 107.

¶ 57    Nevertheless, a state or municipality cannot "escape the Tonnage Clause's reach merely by labelling [the] tax as a charge for services." *Id.* Thus, a fee will qualify as a tax subject to the Tonnage Clause if it is imposed for general, revenue-raising purposes that " do 'not contemplate any beneficial service for…vessels subjected' to the fee." *Lil' Man in the Boat, Inc.*, 2019 WL 8263440, at * 7 (quoting *State Tonnage Tax Cases*, 79 U.S. 204, 220 (1870)). Taxes that may also be prohibited are those imposed by a State that seek to "do that indirectly which she is forbidden…to do directly," such as targeting the vessel by targeting a ship's representative. (Internal quotation marks omitted.) *Polar Tankers*, *Inc.*, 557 U.S. at 8; see *Maher Terminals, LLC*, 805 F.3d at 108 (" 'It is … a duty on the vessel … It is a taxation of the master, as representative

of the vessel and her cargo.' " (quoting *Smith v. Turner*, 48 U.S. 283, 458 (1849) (*The Passenger Cases*)).

¶ 58                                  2. Section 5(b)

¶ 59    33 U.S.C. § 5 was originally enacted in 1884 to prohibit the levying of tolls and operating charges on any watercraft that passed through a lock, canal or canalized river owned by the federal government. *Lil' Man in the Boat, Inc. v. City & County of San Francisco*, 5 F.4th 952, 956 (9th Cir. 2021); *Kittatinny Canoes, Inc.*, 2013 WL 8563483, at *10. Congress "has passed scores of Rivers and Harbors Acts" since, which all in some way have dealt with navigable federal waters, such as appropriating funds for the construction of canals, or relevant here, invalidatin*g* otherwise authorized restrictions to navigation. *Kittatinny Canoes, Inc.*, 2013 WL 8563483, at *15; *Lil' Man in the Boat, Inc.*, 5 F.4th at 956-957.

¶ 60    In 2002, the statute was significantly revised. *Lil' Man in the Boat, Inc.*, 5 F.4th at 956. Specifically, section 5 was amended in conjunction with, among other congressional acts, the MTSA. *Id.*; *Kittatinny Canoes, Inc.*, 2013 WL 8563483, at *10. The amendments were enacted in response to the events of September 11, 2001, apparently "out of concern that United States ports were vulnerable to security breaches." *Lil' Man in the Boat, Inc.*, 5 F.4th at 956-57. The 2002 amendments modified section 5's prohibition by expressly prohibiting tax, tolls, fees, and operating charges but also allowing for limited exceptions depending on the nature of the tax or fee. *Id.* at 957. Section 5 was also meant to be read consistently with over one hundred years of federal tonnage clause and commerce clause progeny. *Id.*; *State v. Alaska Riverways, Inc.*, 232 P.3d 1203, 1222 (Alaska 2010); see *State v. North Pacific Fishing, Inc.*, 485 P.3d 1040, 1057 (Alaska 2021). Section 5(b) was amended again in 2003 to add an additional exception for allowable charges and fees, now codified at 33 U.S.C. § 5(b)(3), which allowed for the levying of

property taxes on vessels and watercrafts not primarily engaged in foreign commerce. See Vision 100—Century of Aviation Reauthorization Act, Pub. L. No. 108-176 § 205, 117 Stat. 2490.

¶ 61    As noted by the circuit court, very few courts have had occasion to interpret section 5(b), given its recent amendments. Our research confirms as much with regard to federal courts.[7] See *Maher Terminals, LLC*, 805 F.3d 98 (addressing whether a state's lease agreement with a landslide marine terminal operator violated the RHA and Tonnage Clause); *Lil' Man in the Boat, Inc.*, 2019 WL 8263440 (addressing whether maritime landing fees assessed against commercial vessels to dock in harbor violated the RHA).

¶ 62    There have been some state-based challenges at the trial, appellate, and supreme court levels. See *North Pacific Fishing, Inc.*, 485 P.3d 1040 (addressing whether a fishery resource landing tax levied against commercial floating fishers violated the tonnage clause and section 5(b)); *Alaska Riverways, Inc.*, 232 P.3d 1203 (whether a per-passenger lease fee levied against paddlewheel tour boats violated section 5(b)); *High Country Adventures, Inc. v. Polk County*, No. E2007-02678-COA-R3-CV, 2008 WL 4853105 (Tenn. Ct. App. Nov. 10, 2008) (addressing whether a county privilege tax imposed on consumers participating in commercial rafting ventures, but collected by operators of such businesses, was preempted by section 5(b)); *Moscheo v. Polk County*, No. E2008-01969-COA-R3-CV, 2009 WL 2868754 (Tenn. Ct. App. Sept. 2, 2009) (addressing whether a state privilege tax on whitewater rafting consumer's admission was preempted by section 5(b)); *Reel Hooker Sportfishing, Inc.*, 236 P.3d 1230 (addressing whether

---

[7]We note merely in passing that in our research of the limited body of case law interpreting Section 5(b), two federal courts have examined whether Section 5(b) even allows for a private right of action for enforcement of the statute against state or local tax ordinances. See *Cruise Lines International Ass'n Alaska v. City & Borough of Juneau*, 356 F. Supp. 3d 831, 845-847 (D. Alaska 2018) (holding that Congress intended to provide a private cause of action for vessels, crews, and passengers); see also *Lil' Man in the Boat, Inc.*, 5 F.4th at 963-964 (holding that Congress did not intend to create an implied private of action to enforce section 5(b)(2) of the statute).

the imposition of a state general excise tax on charter fishing boat businesses was preempted by section 5(b)); *Kittatinny Canoes, Inc.*, 2013 WL 8563483 (addressing whether a county amusement tax for amusements conducted on river is preempted by section 5(b)).

¶ 63 That said, in Illinois, we had occasion to interpret section 5(b) in *Wendella I*, which provided a limited interpretation of section 5(b) as applied to the City's general amusement tax. Although *Wendella I* is not directly on point with the precise issue on appeal now before us, as Wendella would like us to believe, it nevertheless serves as guidance for our analysis.

¶ 64                                     3. The Tour Boat Operator Tax

¶ 65 As a threshold matter, we observe, as did Wendella, that the City has not argued that its tour boat operator tax falls into any of the exceptions delineated within section 5(b).[8] The parties do not dispute that the tour boat operator tax is a tax, nor that Wendella's tour boats utilize federal navigable waters. The dispute, then, is simply whether the tour boat operator tax is preempted by section 5(b). Resolution lies within the plain language of section 5(b), which prohibits "*taxes*, *tolls, operating charges, fees*, or any other impositions whatever *shall be levied upon or collected from any vessel or other water craft*, or *from its passengers or crew*, by any non-Federal interest, if the vessel \*\*\* *is operating on any navigable waters* subject to the authority of" the federal government. (Emphasis added). 33 U.S.C. § 5(b) (2018).

¶ 66 The City urges us to find no preemption for a variety of reasons, which can be boiled down to the following. The City argues that the tour boat operator tax is not actually a tax on the vessel, but on the business revenue or income of the company, citing *Reel Hooker Sportfishing, Inc., Lil'*

---

[8]Permissible fees under section 5(b) include port or harbor dues (33 U.S.C. § 5(b)(1) (2018)), reasonable service fees to the vessel (*id.* § 5(b)(2)(A)), reasonable fees that "enhance the safety and efficiency of interstate and foreign commerce" and does not otherwise "impose more than a small burden on [such] commerce" (*id.* § 5(b)(2)(B), (C)), or property taxes on the vessel (*id.* § 5(b)(3)).

*Man in the Boat, Inc.*, and *North Pacific Fishing, Inc.,* in support. Further, according to the City, section 5(b) is not "unmistakably clear" that the statute is intended to reach those types of taxes, and the legislative history only bolsters the conclusion that it does not. The City contends that this interpretation of the statute is consistent with Tonnage Clause progeny, which only sought to prohibit taxes and fees on vessels undergoing ordinary transit operations, citing *Maher Terminals, LLC*, in support.[9]

¶ 67    We begin with an analysis of the term "vessel." The parties do not argue that the definition of "vessel" is ambiguous; they simply disagree on whether "vessel" is limited solely to the boat itself or whether the term encompasses the vessel's representatives, such as its captain or other staff. The City contends that it does not. Section 5(b) does not define the term "vessel," thus we turn to its plain and ordinary meaning. See *Barrall v. Board of Trustees of John A. Logan Community College*, 2020 IL 125535, ¶ 18 ("When [a] statute contains undefined terms, it is entirely appropriate to employ a dictionary to ascertain the plain and ordinary meaning of those terms." (Internal quotation marks omitted.)). Merriam-Webster's Dictionary defines "vessel" as a "watercraft bigger than a rowboat," with synonymous terms being "boat" or "ship." Merriam-Webster's Dictionary (11th ed. 2006). Black's Law Dictionary defines "vessel" as a "ship, brig, sloop, or other craft used—or capable of being used—to navigate on water." Black's Law Dictionary (11th ed. 2019). Another federal statute, delineating "Rules of Construction" for

_____

[9]We observe that the City attempts to set forth arguments related to the uniformity and equal protection clauses, which are imbedded within a footnote in its brief. The circuit court did not address those arguments in its order. Regardless, the City's arguments are undeveloped and will not be considered. See Ill. S. Ct. R. 341(a) (eff. Oct. 1, 2020) ("Footnotes are discouraged, but, if used, may be single-spaced."); *Illinois School District Agency v. St. Charles Community Unit School District 303*, 2012 IL App (1st) 100088, ¶ 31 ("Substantive arguments may not be made in footnotes." (Internal quotation marks omitted.)); *Block 418, LLC v. Uni-Tel Communications Group, Inc.*, 398 Ill. App. 3d 586, 590 (2010) (party forfeited issue due to undeveloped contentions; a party's failure to comply with our supreme court rules is grounds for forfeiture on appeal).

interpretation of statutes, has defined "vessel" as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3 (2018). Thus, when simply looking at the term in isolation, it would seem that the City's position is correct.

¶ 68    However, section 5(b) also prohibits taxes on "passengers" and a vessel's "crew." Merriam-Webster's Dictionary defines as "crew" as: "2a: a group of people associated together in a common activity or by common traits or interests *** 2b: the whole company belonging to a ship sometimes including the officers and master." Merriam-Webster's Dictionary (11th ed. 2006).

¶ 69    Further, as pointed out by Wendella and the circuit court, the term "vessel" has also been interpreted by federal courts much more expansively than just a reference to a ship, at least in the context of taxation. Indeed, tonnage clause progeny instructs that "vessel" has been interpreted to include the ship captain, owner, supercargo, and its passengers. See *Maher Terminals, LLC*, 805 F.3d at 106. We are, of course, mindful of the initial purpose of the tonnage clause, which was to prohibit economic discrimination among the states, and originally focused on a ship's cargo capacity. But we are also aware of the clause's development over time and the presumption that, at the time a statute is drafted, Congress "is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Moreover, the cases interpreting section 5(b) indicate that the statute was crafted to codify already existing common law in relation to the tonnage and commerce clauses, as demonstrated by section 5(b)'s exceptions to the general prohibition against taxes and fees. See *Lil' Man in the Boat, Inc.*, 5 F.4h at 957; *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, 566 F. Supp. 2d 81, 102-103 (D. Conn. 2008); *Alaska Riverways*, *Inc.*, 232 P.3d at 1222.

¶ 70    On the one hand, we acknowledge that the purpose of the City's tour boat operator tax is to collect fees for the privilege of offering an amusement within the City, and that other parts of the ordinance are admittedly imposed against *all* defined amusements within city limits. But the principles of federal preemption, in conjunction with those of statutory interpretation, require us to focus our inquiry on the plain language of the federal statute, and in our view, section 5(b) is clear as to what it prohibits. Section 5(b) plainly prohibits "taxes, tolls, operating charges [and] fees" on any vessel, or its passengers or crew, whether "levied upon or collected." 33 U.S.C. § 5(b) (2018). The statute expressly carves out exceptions for fees related to the service or maintenance of the vessel, as well as property taxes. If Congress believed that there should be additional exceptions to this general prohibition, it would have continued to delineate them therein, especially since section 5(b)(3) was added to the RHA a year after the statute was originally amended in 2002. See *Grady v. Illinois Department of Healthcare & Family Services*, 2016 IL App (1st) 152402, ¶ 10 ("[A] court may not deviate from [statutory] language by inferring exceptions or conditions that the [legislature] did not set forth."); *People v. Roberts*, 214 Ill. 2d 106, 117 (2005) ("[T]he expression of one thing is the exclusion of another." (Internal quotation marks omitted.)). This implies that Congress actively considered inclusion of certain taxes and chose only to exempt those. See *Kittatinny Canoes, Inc.*, 2013 WL 8563483, at *15 ("Through the [RHA] and the vast array of other statutes found under Title 33, Congress has made clear, however implicitly, that the states are foreclosed from regulating the navigable waters of the United States. And '[w]here Congress occupies an entire field…even complementary state regulation is impermissible.' " (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)).

¶ 71    Furthermore, it is a cardinal rule of statutory interpretation that it is the function of courts to only declare and enforce the law as enacted by the legislature, and we will not " 'annex new

provisions or substitute different ones, or read into a statute exceptions, limitations, or conditions which depart from its plain meaning.' " (Internal quotation marks omitted.) *Brunton v. Kruger*, 2015 IL 117663, ¶ 60 (quoting *People ex rel. Department of Professional Regulation v. Manos*, 202 Ill. 2d 563, 568-69 (2002); see *Kittatinny Canoes, Inc.*, 2013 WL 8563483, at *10 ("[T]he statute provides a clear mandate that no taxes…shall be levied upon or collected from vessels *** operating on navigable waters ***. Absent an express provision declaring invalid *any* state or local taxes on watercraft operating on navigable waters, Congress could scarcely have been more clear about its intention to deny state and local governments the ability to levy taxes on watercraft operating on navigable waters." (Emphasis added and internal quotation marks omitted.)).

¶ 72    Finally, we believe that our interpretation of the statute comports with tonnage clause progeny, where a tax on the operator of a tour boat is, albeit indirectly, a tax on the vessel. See *Polar Tankers, Inc.*, 557 U.S. at 8 (the tonnage clause forbids a State to " 'do that indirectly which she is forbidden…to do directly' " (quoting *The Passenger Cases*, 48 U.S. at 458) including taxes and fees, " 'even though not measured by the tonnage of the vessel, which operate to impose a charge for the privilege of entering, trading in, or lying in a port' " (quoting *Clyde Mallory Lines*, 296 U.S. at 265-66)). Within the City's amusement tax, the term "tour boat operator" is not defined, but "operator" and "owner" are. An "operator" is anyone who sells or resells a ticket to an amusement and collects the charges paid for the sale of an amusement, whether on-line, in person, or otherwise. "Owner" is defined, among others, as one who has an ownership interest in a tour boat where a place of amusement might be held. Regardless of how Wendella is characterized, either definition implies a relationship to the tour boat, *i.e.* the vessel, and more specifically here, the amusement being offered.

¶ 73    At oral argument, the City made much of the fact that the intent of the ordinance is to place the tax burden on Wendella as a corporate entity and not specifically the operator of a tour boat. Not only does tonnage clause precedent dictate that this is a distinction without a difference, but by its own language, the ordinance does not support that interpretation. The tour boat operator tax is imposed on "*all persons engaged in the business of operating tour boats in the City*." (Emphasis added.) Chicago Municipal Code § 4-156-032(A) (amended Apr. 24, 2020). "Person" is defined in the ordinance as "*any natural individual*, firm, society, foundation, institution, *partnership, limited liability company, association*, joint stock company, joint venture, *public or private corporation*, receiver, executor, trustee or other representative *** or any other entity recognized by law." (Emphases added.) Chicago Municipal Code § 4-156-010 (amended May 25, 2022).[10] Thus, the ordinance does not distinguish between corporate entities or an actual, physical person. This is echoed in the definition of "operator," who is "any person who sells or resells a ticket or other license to an amusement *** directly through an agreement or arrangement with another party." *Id.* Finally, an "owner" is "any person with an *ownership *** interest*" "where an amusement is being held." (Emphasis added.) *Id.*

¶ 74    Further, and again by its own language, a tour boat operator is ultimately still responsible for the collection of total charges paid by a patron of the tour. Although the ordinance appears to suggest that "charges paid" may not include the tour boat operator tax, as the City has stated in its brief and in oral argument, Wendella is still legally responsible for remitting the tax, or in other words, responsible for collecting it. Thus, it appears to be an inescapable conclusion that a tax imposed on the selling of a ticket for a ride on a tour boat, where the operator collects the charges

---

[10]Again, this section of the ordinance was amended on May 25, 2022, but its amendments did not affect the quoted language herein.

paid by a patron, is still ultimately collected by the vessel or its crew, and thus becomes a tax on the vessel itself. See *Maher Terminals, LLC*, 805 F.3d at 107 ("the Tonnage Clause was meant to protect vessels as vehicles of commerce"). The limited case law we have found specifically with regard to similar amusement taxes also supports this interpretation. See *High Country Adventures, Inc.*, 2008 WL 4853105, at *12-13 (amusement "privilege tax" imposed on, charged by, and collected by "operators" of commercial rafting ventures was preempted by federal law as there was a "manifest conflict" between section 5(b) and the local tax); see also *Moscheo*, 2009 WL 2868754, at *14-16 (privilege tax imposed on consumer of whitewater rafting amusements preempted by section 5(b)).

¶ 75    We also find the City's cited authority in support of its position to be unpersuasive for a variety of reasons, ranging from our disagreement with each court's interpretation of section 5(b) to the distinguishable nature of the taxes themselves. For instance, the City argues that *Reel Hooker Sportfishing, Inc.*, a case from the Intermediate Court of Appeals of Hawaii, supports the conclusion that taxes on the revenue or income of a business do not violate section 5(b). In *Reel Hooker Sportfishing, Inc.*, 236 P.3d at 1231-1232, a charter boat fishing businesses challenged a state-based excise tax assessment. The charter boat businesses owned and operated three passenger vessels that utilized Hawaii ports to load and pick up its customers. *Id.* at 1232. The court found that section 5(b) did not preempt the excise tax. *Id.* at 1235-1236.

¶ 76    The court's analysis ultimately hinged on the distinction between a tax on a business versus a tax on a consumer. The court observed that the plain language of the tax was a tax on gross income and gross receipts and was a "privilege tax" for doing business within the state and enjoying the "protections and benefits given by the [s]tate." *Id.* at 1234. The court noted that the excise tax did not require that the business collect the tax from its customers. *Id.* at 1235. However,

the court continued, even if it were to find that the tax collected had resulted from the business's attempt to pass through the charge to its customers or passengers, the nature of the excise tax was not transformed from a tax on the business to a tax on the passengers. *Id.* Further, the court found that the express language of section 5(b) did not explicitly prohibit taxation of a corporation's gross income for engaging in the business in the state. *Id.* at 1234-35. Notably, the court's conclusion was bolstered by its reliance on section 5(b)'s legislative history, which included a United States House Conference Report (H.R. Rep. No. 108-334, at 180 (2002) (Conf. Rep.)) and a comment made by one of the bill's sponsors that sales or income taxes were not meant to be prohibited by section 5(b). *Reel Hooker Sportfishing, Inc.*, 236 P.3d at 1235-36.

¶ 77     We decline to follow *Reel Hooker* as we believe it was wrongly decided. To the extent that any portion of the excise tax may be passed through to the charter boat's customers, we believe that the tax in *Reel Hooker* was in conflict with section 5(b). Further, the fact that the Hawaii statute imposing the excise tax expressly places the taxation burden on the business and not the customers is not dispositive. *Chicago Health Clubs, Inc. v. Picur*, 124 Ill. 2d 1 (1988), is instructive.

¶ 78     In *Chicago Health Clubs*, *Inc.*, the plaintiffs challenged the constitutionality of an amendment to the Chicago amusement tax ordinance that added health clubs and racquetball clubs to the list of amusements for purposes of the amusement tax ordinance. *Id.* at 4-6. Relevant here, the plaintiffs argued that the challenged tax was an unconstitutional occupation tax in violation of the Illinois Constitution and enacted without prior authorization of the General Assembly. *Id.* at 8-9. The defendants, who were all individuals or entities within the City of Chicago, argued that the tax was not an occupation tax because it was expressly imposed upon the patrons, rather than the operators, of the health and racquetball clubs. *Id.* at 9. Our supreme court stated that the fact

that the "legal incidence of the tax [was] ostensibly placed upon the members of the club [was] not dispositive" as to the characterization of the tax. *Id.* Relying on a principle earlier espoused in *Commercial National Bank of Chicago v. City of Chicago*, 89 Ill. 2d 45 (1982), the court stressed the need to look to the "practical operation and effect" of the ordinance "rather than only to a facial declaration contained therein." *Chicago Health Clubs*, 124 Ill. 2d at 10. In so doing, the court concluded that the practical effect of the defendants' amusement tax amendment was the imposition of an unconstitutional occupation tax. *Id.* at 10-12.

¶ 79    Section 5(b) is clear regarding its prohibition on taxation of vessels navigating in federal waters. Thus, notwithstanding the Hawaii statute's characterization of the tax as either an excise or privilege tax, to the extent that its practical effect is a pass-through of costs to the charter boats' customers, the ordinance runs afoul of the plain language of section 5(b).

¶ 80    Even accepting that the tax in *Reel Hooker* is purely a tax on the business, and not a pass-through, we would still find the case then to be clearly distinguishable, as the Hawaii excise tax and here, the City's tour boat operator tax, are substantively different. The Hawaii general excise tax specifically is imposed on "four per cent of the *gross income* of the *business*." (Emphases added.) See Haw. Rev. Stat. Ann. § 237-13(6)(A) (West 2018). In contrast, the City's tax here is to be collected from *charges paid* by what still appears to be by a single patron's purchase. Although the tour boat operator is now responsible for collection of "charges paid," the tax still functions directly on the single ticket purchased by the patron, rather than the gross collection of tickets by the business. "Charges paid" is defined as "the gross amount of consideration paid for the *privilege to enter*," which "includes *any and all charges that the patron pays* incidental to obtaining the privilege to enter, *** to view or to participate." (Emphases added.) Chicago Municipal Code § 4-156-010 (amended May 25, 2022). As we have also mentioned prior,

*Wendella I* already instructs that placing the tax on the "patron," which is synonymous with "passenger," is violative of section 5(b) on its own accord. Although the City purports that its new tax does not run afoul of our court's holding there, we disagree. The tour boat operator tax is now imposed on "all persons in the business of operating tour boats," and the tax is based on the "charges paid to the tour boat operator." Although that portion ordinance does not state "charges paid to the tour boat operator *by the patron*," the term "charges paid" is defined, in pertinent part, as "amount *** paid for the privilege to enter, *** witness, *** view, or to participate in an amusement," and includes "any and all charges that the *patron pays incidental to obtaining the privilege to enter*." (Emphasis added.) *Id.*. Moreover, even without referring back to the ordinance, one need not be a legal scholar to be able to discern from whom those charges are collected.

¶ 81     Although not fatal, we note additionally that the *Reel Hooker* court's analysis deviated from well-established principles of statutory interpretation, which require us to solely look at the words of the statute as written. See *Tillman*, 2021 IL 126387, ¶ 17. Only when an ambiguity is found should a court turn to a given statute's legislative history. *Krohe*, 204 Ill. 2d at 397-98. The *Reel Hooker* court did not state that it found such an ambiguity and instead glossed over the plain language of section 5(b) by only briefly commenting that the express terms of the statute did not "address the business revenue or gross income generated by a business that operates the vessel." *Reel Hooker Sportfishing, Inc.*, 236 P.3d at 1234. Thereafter, the court impermissibly placed undeserved emphasis on parts of the congressional record that preceded the passage of section 5(b) in order to "ascertain" the statute's intent. The intent of section 5(b) is clear. It broadly prohibits *taxes* and *fees*, and only within its subsections does it allow for limited exceptions to its reach, specifically in the form of *reasonable* fees and *property* taxes. Notably, the *Reel Hooker* court failed to address any of those delineated exceptions in its discussion of the statute.

¶ 82    The City also relies on *North Pacific Fishing, Inc.*, 485 P.3d 1040. There, the Alaska Supreme Court considered whether a landing tax on commercial floating fisheries violated section 5(b) as well as the tonnage clause. *Id.* at 1045-1046. Plaintiffs were two floating fishing companies that utilized vessels outside of Alaskan territorial waters to catch and process fish and then later arrived in Alaska to unload the processed fish. *Id.* at 1045. The companies were subject to a "landing tax" rather than a "fisheries business tax," which was intended to act as a compensatory tax for utilizing the services and benefits of the state without actually fishing in Alaskan waters. *Id.* at 1045-46. The tax itself was based on the total value of the raw, unprocessed fish. *Id.* at 1046.

¶ 83    The Alaska Supreme Court ultimately found the tax to be constitutional. With regard to the tonnage clause, the court found that the landing tax was assessed on the fish product itself rather than on the vessel, and thus outside the scope of the tonnage clause, which the court interpreted to prohibit duties based on cargo capacity of larger ships simply for entering in, lying in, or trading in port. *Id.* at 1055-56. The court found that the companies were only subject to the landing tax because they operated a floating fisheries business, but had otherwise escaped the ambit of the general fisheries business tax by not catching and processing its fish product in Alaskan waters. *Id.* at 1056. Thus, the tax was not simply levied just for entering Alaskan ports. *Id.* As to section 5(b), the court also did not find preemption. *Id.* at 1056-1058. The court turned to section 5(b)'s legislative history to support its previous conclusion that the landing tax was not a tax assessed on the vessel, its passengers, or crew, and instead was levied on the value of unprocessed fish that was later converted into frozen fish product. *Id.* at 1057. In so ruling, the court distinguished its holding from that of a previously decided case, *Alaska Riverways, Inc.*, where the court found that a per-passenger fee for a tour boat operator's use of state-owned riverbanks, and otherwise unrelated to the rental value of the land being used, violated section 5(b). *Id.* at 1057-1058.

¶ 84    We also find *North Pacific Fishing, Inc.,* distinguishable. Preliminarily, we note that the *North Pacific Fishing, Inc.,* court engaged in the same impermissible analysis as the *Reel Hooker* court, where it also examined section 5(b)'s legislative history by making specific reference to the comments of a single congressperson prior to the statute's amendment. As to the tax itself, the *North Pacific Fishing, Inc.,* court determined that the relevant tax was levied solely on fish product and not the actual business of utilizing the waterways. In contrast here, the tour boat operator tax is levied on an amusement that utilizes federally navigable waters as its business. Put another way, Wendella's "product" is the operation of the tour itself, which is conducted on a vessel. See *Alaska Riverways, Inc.*, 232 P.3d at 1221 (Alaska 2021) (finding a per-passenger fee assessment on paddlewheel tour boats, levied against the operator, "however labeled, is a charge exacted *specifically* for the use of navigable waters" regardless of its name or form); see also *Moscheo*, 2009 WL 2868754, at *16 (finding preemption against a local amusement tax when the tax was deemed as a "general revenue measure").

¶ 85    Finally, the City argues that *Lil' Man in the Boat, Inc.*, a federal slip opinion from the Northern District of California, also dictates that its tour boat operator tax is not preempted by section 5(b).[11] Again, we disagree. In *Lil' Man in the Boat*, plaintiff was a commercial charter business that provided transportation and hospitality services in San Francisco Bay and used various harbors as a base for its commercial enterprises. *Lil' Man in the Boat, Inc.*, 2019 WL 8263440, at *1. Plaintiff previously paid a landing fee per docking to load and unload passengers. In 2016, the city increased its landing fees and sought to enter into a contract with all commercial

---

[11]The plaintiff appealed the district court's ruling to the Ninth Circuit, but the court did not reach the merits of whether the tax violated section 5(b) or the Tonnage Clause. Instead, the Ninth Circuit affirmed on other grounds, holding that the plaintiff did not have a private right of action to bring the suit. *Lil' Man in the Boat, Inc.*, 5 F.4th at 963-964.

vessels that now imposed a gross revenue fee for all months the vessel docked at the port, in order to pay for upkeep and usage of its facilities. *Id.* Plaintiff challenged this new scheme and alleged, among others, that the new contract's requirements violated section 5(b) and the tonnage clause. *Id.* at *2.

¶ 86 With regard to the tonnage clause, the district court did not find any violation, as the "nominal" landing fee had been issued in exchange for service rendered to the charter vessels, such as through walkways and restroom facilities, security, cleanliness, and available staff members to support the vessel's operations and did not impose any taxes or duties on the vessels themselves. *Id.* at *7-8. As to section 5(b), the court also did not find a violation for similar reasons, in that such fees were "charged only to commercial vessels that voluntarily land and avail themselves of the *** services provided" by the harbor and relied also in part on the congressional record to bolster its decision. (Internal quotation marks omitted.) *Id.* at *8-9.

¶ 87 Similar to the two cases discussed above, the court in *Lil' Man in the Boat, Inc.,* also considered section 5(b)'s legislative history. Even so, we find the case distinguishable. Here, unlike in *Lil' Man in the Boat, Inc.*, there is no evidence in the record here that the taxes collected by the City are used for services to the dock or any other services to Wendella tour boats. The tax collected by the City is a general amusement tax, and there is nothing to indicate for what purpose the tax is collected. Instead, the City simply calls it a "complementary" tax, which, as it has admitted prior, was enacted in anticipation of our ruling in *Wendella I* to offset whatever revenue losses it is unable to collect from the general amusement tax as applied to tour boat companies.

¶ 88 On that point, we also reject the City's characterization of the tour boat operator tax as "complementary" to the general amusement tax found in section 4-156-020. The City argues that the tour boat operator tax levels the playing field between amusements offered on land and those

offered on water to prevent impermissible competitive advantage, citing *Archer Daniels Midland Co. v. City of Chicago*, 294 Ill. App. 3d 186 (1997), and *Irwin Industrial Tool Co. v. Department of Revenue*, 238 Ill. 2d 332 (2010), in support. The City's argument is unavailing. First, this contention ignores the fact that *Wendella I* already dictates that, in at least one reading of section 5(b), the City's general amusement tax is preempted by federal law and thus cannot be imposed on Wendella. The City appears to believe that by simply drafting a carve-out of the originally problematic ordinance, it somehow escapes that conclusion. But as we have already held, no matter how many times the City may attempt to rewrite its ordinance, such changes are of no import when, at the end of the day, the tax burden either falls on the patron or on the owner or operator of a tour boat operating on federal navigable waters, all of which are prohibited by federal law.

¶ 89    Second, the City's cited authority is distinguishable, as both cases not only involved the imposition of state-based sales and use taxes on out-of-state companies unrelated to the amusement industry but also were challenges to federal and state constitutional provisions not at issue here. Specifically, *Archer Daniels Midland Co.* concerned whether the federal commerce clause and Illinois's uniformity clause barred Illinois's attempt to impose a natural gas use tax on out-of-state sellers. 294 Ill. App. 3d at 187. *Irwin Industrial Tool Co.*, 238 Ill. 2d at 333-334, 340-341, was also a commerce clause challenge and concerned a state use tax imposed against out-of-state purchasers, which served to complement a retail occupational tax imposed on in-state purchasers as applied to the sale of tangible personal property. Both taxes were found to be valid, but neither provide any guidance to the limited issue before us today. *Id.* at 351.

¶ 90    In closing, we acknowledge that, as raised numerous times by the City, there is a presumption against finding preemption particularly in the context of state and local taxation. Nevertheless, the language of section 5(b) is clear as to what it contains and what it does not. The

exceptions contained therein in an otherwise fairly comprehensive statutory scheme, dating back to the 1800s, do not contain any reference to this type of local tax. It is not unreasonable to conclude that if Congress viewed taxes such as the tour boat operator tax as permissible, it would have included them. As the circuit court noted, "this court cannot amend the statute or depart from congressional intent by judicial fiat." Simply put, we cannot enforce what does not exist.

¶ 91      As such, we find that the circuit court did not err when it found that section 5(b) of the RHA preempted the City's tour boat operator tax. Accordingly, we affirm the circuit court's granting of summary judgment to Wendella as to count I of its complaint.

¶ 92                                     III. CONCLUSION

¶ 93      For the reasons stated, we affirm.

¶ 94      Affirmed.

*Wendella Sighting Co. v. City of Chicago*, 2023 IL App (1st) 211371

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 19-CH-3022; the Hon. John J. Curry Jr., Judge, presiding. |
| **Attorneys for Appellant:** | Celia Meza, Corporation Counsel, of Chicago (Myriam Zreczny Kasper, Suzanne M. Loose, Stephen Collins, and Tara Kennedy, Assistant Corporation Counsel, of counsel), for appellant. |
| **Attorneys for Appellee:** | Stuart P. Krauskopf, Kurt A. Kauffman, and Jamie S. Ritchie, of Krauskopf Kauffman, P.C., of Chicago, for appellee. |